CLIFFORD G. LEE, JR., Plaintiff-Appellee, *v.* THE HEIGHTS BANK, Defendant-Appellant.

Third District   No. 82—82

Opinion filed February 9, 1983.—Rehearing denied March 21, 1983.

988

Dean B. Rhoads, of Sutkowski & Washkuhn Associates, of Peoria, for appellant.

Mark D. Hockman, of Leiter, Leiter & Sahn, of Peoria, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

This action was brought by Clifford G. Lee, Jr., to recover compensatory and punitive damages occasioned by the alleged fraud of the Heights Bank inducing Lee to cosign a promissory note. The Heights Bank counterclaimed for $1,000 plus interest on another note from Lee to the Heights Bank to fulfill his obligation under the first note. The jury returned a verdict for Lee for $25,000 in compensatory damages and $50,000 in punitive damages. Subsequently, the trial court ordered a remittitur and entered judgment for Lee in the amount of $10,993.62 as compensatory damages and $22,000 as punitive damages. The Heights Bank appeals and presents the following issues for review: (1) whether the plaintiff settled or waived his fraud claim against the defendant as a matter of law; (2) whether the closing argument by plaintiff's counsel was improper and prejudicial; (3) whether the court abused its discretion in permitting the jury to return an award of punitive damages against the defendant. The plaintiff's brief raises the issue of whether the court abused its discretion in ordering a remittitur.

On April 29, 1974, Lee's then brother-in-law, Gregory Gordon, as officer and agent of Potpourri Publications, Inc., signed a $7,000 single payment time promissory note, No. 281. The note's due date was June 29, 1974, and was in favor of the Heights Bank (hereinafter Bank). On the same day, Gregory Gordon executed a security agreement for one $10,000 Pacific Telephone and Telegraph Company bond

as security for the note, No. 281.

Potpourri Publications, Inc., had a checking account with the Bank. On June 24, 1974, this account had a negative balance of $6,831.44. However, on June 25, 1974, $9,215.44 was deposited into the Potpourri account. The source of the deposit was a check from Hornblower and Weeks which represented the proceeds of the sale of the $10,000 Pacific Telephone and Telegraph bond used to secure note No. 281. Note No. 281, however, went into default four days later on June 29, 1974. It remained in default until September 3, 1974, when Gregory Gordon executed a renewal note (No. 399). This renewal note was cosigned by Lee. It was payable to the Bank in the amount of $6,806.30 and was signed at the Bank's premises. Lee testified that at the time this renewal note was signed, he was assured by Mr. Schafer, the Bank's chief operating officer and executive vice-president, that the note had as collateral a $10,000 Pacific Telephone and Telegraph bond. Lee further testified that the note at the time of signing, on its face, contained language concerning the collateral.

Several weeks before note No. 399 was signed, Lee contacted Schafer about receiving an $8,000 unsecured loan from the Bank. Lee, a real estate broker, sought the loan to finance his purchase of an apartment building. Lee had previously dealt with Schafer in obtaining unsecured loans from the First National Bank of Peoria when Schafer was associated with that institution. Schafer suggested that Lee contact him at a later date, when Schafer was less busy. Schafer, however, indicated to Lee that he didn't see any problem with the unsecured loan, but at the same time made no promises. Thereafter, Lee tried unsuccessfully to contact Schafer several times. Finally, on September 3, 1974, Schafer called Lee, apologizing for not contacting him sooner. Schafer told Lee he needed a favor from him and requested that Lee come to the Bank at 2 p.m. Lee agreed.

Lee then met Schafer and Gregory Gordon who was present in Schafer's office when Lee arrived at 2 p.m. Schafer explained that the Bank examiners were present in the Bank and a problem had developed with Gregory Gordon and Potpourri Publications. Schafer needed Lee's help. When Schafer first explained to Lee that the requested favor was Lee's cosigning, as an accommodation party, a note with Gregory Gordon, Lee refused. Schafer then told Lee the note was fully secured by a $10,000 Pacific Telephone and Telegraph Company bond. When Lee inquired why Schafer needed Lee's signature on a fully secured note, Schafer told him it would help Schafer out with the Bank examiners. When Lee asked Schafer how Schafer knew the note was secured, Schafer showed Lee a copy of the April 29,

1974, security agreement. Reiterating that the note was fully secured, and was without a risk to Lee, Schafer also stated, "you've made a loan request and I am going to help you out, too." After some minutes of deliberation, Lee agreed to cosign the note. According to Lee's testimony, Schafer then produced a blank note which Lee refused to sign. Thereafter, Schafer produced another note, No. 399, for Lee's signature; this note expressly provided, "This Note is secured by Security Agreement dated April 29, 1974." Lee cosigned this note and returned the note to Schafer.

After Lee cosigned the note, Lee reiterated his request for an $8,000 unsecured loan; Schafer replied he was too busy then, September 3, 1974, to discuss it, and invited Lee to call him the following week.

On September 11, 1974, Lee called and arranged an appointment with Schafer to discuss his $8,000 loan request. At their meeting that afternoon, Schafer informed Lee that the Bank's loan committee was insisting on $8,000 in security for the loan. Although objecting to "being loaned his own money," Lee acquiesced, went to his Jefferson Bank safety deposit box, obtained $8,000 worth of Commercial National and Jefferson Bank certificates of deposit, and offered to post these as security for the loan. Schafer refused, saying the Bank would only accept its own certificates of deposit as collateral for the loan. Since Lee had long awaited the $8,000 loan from the Bank and was running short on time to consummate his real estate purchase, he proceeded with the loan on the Bank's terms. He cashed in his certificates of deposit from Commercial National and Jefferson Bank and established two $4,000 certificates of deposit at the Heights Bank.

About three months later, in December 1974 or January 1975, Lee was contacted by Schafer and told that the note that he cosigned with Gregory Gordon was in default. Lee was told to pay the amount due on the note. When Lee advised Schafer that the Bank should and could with Lee's permission sell the collateral, Schafer replied, "There is no collateral *** you're going to have to pay this note." Lee replied, "There is something wrong here; I'm not going to pay that note because it was purported to me that there was collateral." Lee then hung up the telephone.

Sometime in March 1975, Lee and Gregory Gordon signed and delivered to the Bank a "Notice of Dishonor" disclaiming all responsibility for payment on the note and reserving all rights and defenses.

By 1976, Schafer was no longer employed by the Bank and Kenneth Dickey was the Bank's vice-president and chief operating officer. Lee contacted Dickey by phone in early 1976. Dickey told Lee that he

had to pay note No. 399 as it was in default. The two men met personally in April 1976. Lee told Dickey that he could not understand how he could owe on a note when there was collateral. Dickey informed him that "There is no collateral on the note. The collateral has been sold." Dickey again urged that the note had to be paid by Lee as the Bank could not collect from Gregory Gordon. Dickey reminded Lee about his certificates of deposit with the Bank and that the Bank could use them to pay the debt owed on the overdue note, No. 399. The process would be easy for the Bank but would ruin Lee's excellent credit rating. Dickey suggested that the two of them meet with James Kellstedt, who was represented to be the attorney for the Bank.

Later in the spring of 1976, Lee met with Dickey and attorney James Kellstedt. At this meeting, Lee was again informed that, since the Bank could not collect from Gregory Gordon, the Bank was looking to Lee for payment.

Dickey and Kellstedt explained that, unless Lee agreed to pay the note, the Bank would sue him or apply his certificates of deposit toward payment on the overdue note. When Lee repeatedly insisted that the overdue note was secured, he was told there was no collateral that it had been sold. When Lee queried how the Bank could sell the collateral without applying the proceeds toward the note, Dickey and Kellstedt advised Lee to forget about the collateral and unless Lee paid the note, the Bank would take Lee's certificates of deposit or sue him. Lee "felt intimidated at this point" and asked what could be worked out. The parties discussed the matter and agreed that Lee could pay off the overdue note by giving the Bank approximately $2,000 in cash, a time note and an installment note.

On June 21, 1976, Lee met with the Bank's president. Lee paid the Bank $2,000 in cash and signed two renewal notes each in the sum of $3,000. The Bank's president suggested to Lee that since Lee had paid the note, the Bank would assign the note to Lee and he could attempt collection from Gordon. Accordingly, he signed the note No. 399 and transferred it to Lee. It was at this moment, Lee testified, that he first became aware that the reference to the collateral had been "X-ed" out. Lee brought this to the attention of the Bank president, who informed him the matter was closed.

Expert document examiners testified that the reference to collateral on the note was "X-ed" out by a typewriter different from that used in preparation of the remainder of the document, and after the remainder of the document, including the reference to collateral, was prepared.

After the June 21, 1976, transaction, Lee filed suit against Gregory Gordon on the original note and pursued that action for approximately one year before his complaint was dismissed for want of prosecution. Additionally, after the June 21, 1976, transaction, Lee paid the installment renewal note of $3,000 in full and paid all but $1,000 of the $3,000 lump sum promissory note. The payments on those notes by Lee were over a period of approximately two years from June 1976. In all Lee testified that he paid the Bank $10,993.62. Lee further stated that the difficulties resulting from the September 3, 1976, cosigning transaction severely strained his relationship with his then brother-in-law, Gregory Gordon, and more importantly, his marriage, which ended in divorce.

We believe the evidence shows that the Bank through its officer Schafer induced Lee to sign the original note through a representation that the note was secured when in fact it was not. Schafer knew or should have known that the $10,000 Pacific Telephone and Telegraph bond used to secure the note (No. 281) was sold well before he induced Lee to cosign the renewal note (No. 399) on September 3, 1974. Thus, we believe Lee proved by clear and convincing evidence that he was fraudulently induced to cosign the note No. 399. The Bank, however, asserts by way of affirmative defense that Lee waived or settled his claim of fraud by paying the note with cash and issuing two renewal notes.

The Bank argues that under the circumstances of this case, there are two points in time when Lee could have waived his fraud claim. The first was on June 21, 1976, when Lee signed the notes in renewal of his original note (No. 399) and made a cash payment on that obligation. The Bank contends that Lee was fully aware that he had been fraudulently induced to sign No. 399 and that by renewing that obligation he either waived or settled his fraud claim against the Bank. Alternatively, the Bank argues that even if Lee had no knowledge of the fraud prior to or at the time he signed the renewal notes, he acquired such knowledge shortly thereafter whereupon he continued to pay the notes and opted to sue his co-maker. Only after this first suit was dismissed for want of prosecution did Lee decide to sue the Bank. According to the Bank, this delay resulted in a waiver of Lee's fraud claim. We will first consider whether Lee waived or settled his claim when he signed the renewal notes on June 21, 1976.

A prerequisite to any finding of settlement or waiver during this transaction is that Lee, prior to or at the time he signed the renewal notes, was aware that he had been fraudulently induced to sign note No. 399. This requirement raises a question of fact for the jury to de-

cide. We believe that the evidence in this case permitted the jury to find that Lee had no such knowledge.

The Bank relies heavily on a March 12, 1976, letter sent by its then executive vice-president to Gregory Gordon's attorney. Gordon was the co-maker of note No. 399. According to the Bank, this letter allegedly informed Lee that the security for note No. 399 had been sold prior to the time he signed it. We do not believe that this letter conclusively proves that Lee was so informed. The letter was sent to Gordon's attorney, not Lee. And even if Lee was aware of its contents, the letter is by no means a clear disclosure that the security for note No. 399 had been sold before Lee signed it. What is apparent from the letter is that some unidentified bonds had been sold. There is nothing which links that sale to the bond which the Bank represented as security for note No. 399.

The remaining evidence of Lee's state of mind prior to his signing the renewal notes is also capable of differing interpretations. Without engaging in a detailed analysis of this evidence, it reveals simply that Lee was aware that something had gone wrong with the collateral and that he was confused as to why he was being held liable on note No. 399. The evidence does not conclusively prove that Lee was aware that the collateral had been sold prior to the time he signed note No. 399. Therefore, we believe that the evidence was sufficient to permit the jury to find that there was no settlement or waiver and that such a conclusion is not manifestly erroneous.

Next, we will determine the legal consequences of Lee's actions after he admittedly learned of the fraud shortly after the June 21, 1976, transaction.

On June 30, 1976, Lee filed suit against Gordon on note No. 399. Lee received a default judgment which was later reopened by Gordon and then dismissed for want of prosecution on September 31, 1977. From June 1976 until the time Lee filed suit against the Bank on April 4, 1978, he continued to make payments on the renewal notes. Despite the fact that Lee filed his action against the Bank within the five-year limitations period (Ill. Rev. Stat. 1977, ch. 83, par. 16), the Bank charges that there was unreasonable delay in bringing the suit and that by his actions Lee waived his fraud claim. We do not agree.

There is very little case law in Illinois covering waiver as applied to actions at law seeking damages for fraud. And the few cases that do touch on the subject either make an incomplete statement of the law of waiver, or confuse waiver with the equitable rule requiring prompt disaffirmance of a contract before it can be rescinded.

The Bank relies heavily upon *Kaiser v. Olson* (1981), 105 Ill.

App. 3d 1008. This case is correct to the extent that it analyzes the law of waiver with respect to legal actions. But that analysis is deficient in one crucial respect. In *Kaiser,* the court held that a person defrauded in a transaction may, by conduct inconsistent with an intention to sue for damages, waive the right to sue for damages. Such waiver requires that the injured party be aware of the fraud and possess full knowledge of all of its material aspects. In arriving at this definition, the court cites 37 Am. Jur. 2d *Fraud and Deceit* sec. 386 (1968). However, the court did not fully quote from that source. An additional and essential element is that the injured party intend to affirm the contract *and* intend to abandon his right to recover damages for the loss resulting from the fraud. The added element of intent places a heavier burden upon the party asserting waiver. The mere passage of time or delay in bringing suit, without more, does not result in waiver. Without proof of intent, a party who relies on the statute of limitations and files his action within that time could unwittingly relinquish his right to sue through no fault of his own. Before we will permit such a result, the party who raises the defense of waiver must prove that the plaintiff intended to give up his right to sue.

Another case relied upon by the Bank is *Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617. There, the supreme court held that a person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm the transaction with all reasonable diligence so as to afford both parties an opportunity to be restored to their original positions. In *Eisenberg,* the court held that due to their unreasonable delay, the plaintiffs were not permitted to rescind a deed which they were induced to sign by defendant's alleged misrepresentations. The ground for dismissal in the lower court was lack of equity. The instant case is an action at law, and *Eisenberg* has nothing to do with waiver as applied to legal actions. Furthermore, the court in *Eisenberg* stated that there was in fact no fraud practiced upon the plaintiffs of which they could complain because their reliance upon defendant's representations was unreasonable. Such is not the case here. In the present case, the record contains evidence of actionable fraud. For these reasons we find that *Eisenberg* is inapposite to actions at law for damages. Therefore we will proceed to consider whether the evidence was sufficient to demonstrate that Lee, by his actions subsequent to June 21, 1976, intended to abandon his right to sue.

■ The question of intent is one of fact for the jury to decide. After reviewing the chain of events leading up to the commencement

of this suit, we cannot say that the jury's verdict is contrary to the manifest weight of the evidence. Less than two years had passed between the time Lee learned of the fraud and the time he commenced the present action. First, in June of 1976, he sued the co-maker, a readily available party. That suit was based on the original promissory note which had been assigned to Lee by the Bank. When this action was dismissed for want of prosecution, Lee then decided to sue the Bank based on fraud. Only seven months had passed between the termination of the prior action and the commencement of the present suit. From this conduct, we are convinced that Lee was persistently seeking relief through the various means open to him and by no stretch of the imagination did he intend to relinquish his right to sue. The simple fact that he chose one alternate form of relief before suing the Bank does not demonstrate an intent to waive his right to sue.

We also note that Lee's delay in suing the Bank was not for the purpose of reaping a benefit from himself and causing detriment to the Bank. Had he done so, this would be indicative of an intent to abandon his right to sue and instead take whatever benefit there might be from continued performance. By making payments on the notes and trying to sue the co-maker, the only arguable benefit to Lee was to avoid the very real threat of being sued by the Bank and having his credit rating destroyed. In addition, we see no resulting detriment to the Bank. They continued to receive regular payments on the notes as a result of fraudulently inducing Lee to cosign note No. 399. In this respect, the Bank received a benefit at Lee's expense.

Before leaving the issue of waiver, we note that the Bank's argument that Lee is guilty of an unreasonable delay in filing his action can also be construed as a *laches* defense. But *laches* is not simply a matter of time; rather, it is a principle of "inequity founded upon some change in the condition or relation of the *** parties." (*Holland v. Richards* (1955), 4 Ill. 2d 570, 578.) It must appear that a plaintiff's unreasonable delay in asserting his rights has prejudiced and misled the defendant. If the defendant is not injured by the delay, then the plaintiff is not guilty of *laches*. (*Biggs v. Health & Hospitals Governing Com.* (1977), 55 Ill. App. 3d 501, 507.) In this case, Lee is the only injured party and, as previously mentioned, the Bank was not prejudiced by Lee's actions.

The next issue is whether the Bank is entitled to a new trial due to a number of allegedly improper statements made by Lee's attorney during closing argument. The trial court correctly sustained the Bank's objections to most of the comments which it deemed improper. However, the court did not sustain objections to two other comments

which the Bank argues were improper.

According to the Bank, plaintiff's counsel insinuated that the Bank's defense of the action was itself fraudulent. But when defense counsel objected, he admitted that his impression may have been mistaken. Also, in answer to this objection, the court explicitly found that there was no such insinuation and overruled the objection. Based on this record, we find no error.

The Bank also argues that plaintiff's counsel misstated the law and facts with regard to the issue of settlement. Although plaintiff's counsel may have misquoted a portion of a witness' testimony we find no misstatement of the law. Furthermore, we find that any error in closing argument was harmless.

The jury's verdict, at least insofar as liability was concerned, was not influenced by any of the alleged errors. The evidence clearly established that the Bank induced Lee to sign note No. 399 by assuring him that the note was secured when in fact the security had been sold prior to the time Lee signed. On appeal, the Bank does not dispute the sufficiency of this evidence but instead relies on the defense of waiver. As previously discussed, there was ample evidence from which the jury could conclude that there was no waiver.

■ Even if counsel's remarks may have influenced the initial award of $25,000 in compensatory damages and $50,000 in punitive damages, any alleged prejudice was cured when the trial court ordered a remittitur which reduced the damage awards to $10,993.62 and $22,000 respectively.

Next, the Bank raises a number of objections concerning jury instructions. First, the Bank contends that the trial court erred in giving an instruction permitting the jury to return an award of punitive damages. We find that punitive damages were proper in this case.

■ The Bank argues that the justifications for imposition of punitive damages are sharply diminished where, as in the present case, liability is vicariously imposed. In those cases punitive damages can be awarded vicariously against a master only under certain circumstances, one of which is if the agent who engaged in the wrongful conduct was employed in a managerial capacity and was acting within the scope of his employment. (*Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31.) According to the Bank, Lee failed to present any evidence that the Bank's former employee, Mr. Schafer, was acting within the scope of his employment when he fraudulently induced Lee to sign note No. 399. We disagree. The record clearly shows that Mr. Schafer, the Bank's vice-president and chief operating officer, told Lee that note No. 399 was secured by a bond which had in fact been

sold. Also, there was evidence that making representations concerning loans and collateral was within the scope of Mr. Schafer's employment. Therefore, punitive damages were properly allowed.

The Bank's final argument is that the court erred when it refused to instruct the jury that alteration of a promissory note is, of itself, not fraudulent. According to the Bank, the refusal to give such an instruction may have led the jury to return a guilty verdict solely based on the evidentiary fact that note No. 399 had been altered so as to delete the reference to collateral. We find no error.

■■ The alteration of note No. 399 was simply a fact in evidence and the court was not required to give an instruction on every fact in evidence. In addition, we find that the jury was properly instructed as to the elements of fraud and any additional comment on what did *not* constitute fraud was unnecessary.

■■ The final issue is whether the court abused its discretion when it ordered a remittitur which reduced the award of compensatory damages from $25,000 to $10,993.62. This order was entirely proper in light of evidence that Lee's out-of-pocket loss was only $10,993.62, the amount he paid on the notes. General damages in excess of that amount were not supported by the evidence and were based on speculation and conjecture.

■■ The court also ordered that the award of punitive damages be reduced from $50,000 to $22,000. Although we agree that punitive damages were appropriate in this case, due to the vicarious nature of the Bank's liability we find that the court did not abuse its discretion in ordering a remittitur of punitive damages. The reduction in punitive damages was proportionate to the reduction in compensatory damages. (Both awards were reduced by 44%.) Had the award of punitive damages been allowed to stand, the amount would have been almost five times greater than the compensatory damages. A remittitur of punitive damages served to reduce this disparity and was a reasonable exercise of the court's discretion.

Affirmed.

STOUDER and SCOTT, JJ., concur.