**TIME WARNER SPORTS
MERCHANDISING,**
Plaintiff,

v.

**CHICAGOLAND PROCESSING
CORPORATION,**
Defendant.

No. 95 C 1364.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 4, 1997.

William E. Snyder, Michael, Best & Friedrich, Chicago, IL, for Plaintiff.

Howard M. Turner, Robert A. Carson, Kathryn S. Matkov, Gould & Ratner, Chicago, IL, for Defendant.

1. World Cup Domestic and World Cup International are collectively referred to in this opinion

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Time Warner Sports Merchandising ("Time Warner," a division of Time Warner Entertainment Company, L.P.), World Cup '94 Marketing ("World Cup Domestic") and World Cup '94 Marketing International, B.V. ("World Cup International")[1] brought this diversity action against Chicagoland Processing ("Chicagoland"). After a good deal of procedural skirmishing, a year later Chicagoland filed an Amended Counterclaim ("ACC"), naming those three plaintiffs and four other organizations as counter-defendants. Chicagoland and all of the counter-defendants except Time Warner have since settled their differences, resulting in cross-dismissals of the claims and counterclaims involving those parties. Next this Court granted Chicagoland's motion for judgment on the pleadings against Time Warner's Complaint, so that Chicagoland's ACC against Time Warner states the only remaining claims in the action.

Now Time Warner has moved for summary judgment against Chicagoland under Fed R. Civ. P. ("Rule") 56. Both sides have submitted the statements called for by this District Court's General Rule ("GR") 12(M) and 12(N), adopted to highlight the existence or nonexistence of any material fact disputes, together with their respective memoranda. At this point Time Warner's motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, the motion is denied in part and granted in part.

*Summary Judgment Standard*

Under familiar Rule 56 principles, a party seeking summary judgment bears the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose "the nonmovant is entitled ... to have all reasonable inferences drawn in its favor," but this Court "is not required to draw unreasonable

as "World Cup Entities".

inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.*, 116 F.3d 262, 265 n. 2 (7th Cir.1997)).

What follows in the *Background* section is a factual statement drawn from the parties' submissions, with any differences between them resolved in Chicagoland's favor. Facts that fit better into the substantive legal discussion will be set out later.

## Background

In the summer of 1994 the United States hosted the World Cup Soccer Tournament ("Tournament") (T.W. 12(M) ¶ 2).[2] In anticipation of that event, in 1992 sports merchandising company Time Warner entered into agreements with both World Cup Entities to act as their exclusive worldwide representative in the licensing of certain trademarks and tradenames of the Tournament (*id.*).

Chicagoland,[3] one of the largest producers of officially licensed sports and entertainment medallions in the United States (*id.* ¶ 4), also became interested in the World Cup market during the same time frame (C. 12(N) ¶ 113). In February 1992 its President John Obie ("Obie") met several times with Time Warner's Director of Business and Legal Affairs Paul Epner ("Epner") to discuss obtaining a license to manufacture and sell medallions commemorating the Tournament (*id.* ¶ 116; T.W. 12(M) ¶ 10). Chicagoland says that during those meetings Epner made the following representations on behalf of Time Warner:[4]

1. Time Warner was the exclusive world-wide licensor for Tournament sponsorship and licenses (C. 12(N) ¶ 116).

2. Because Chicagoland would have an exclusive license, no other coins (including money issued by sovereign governments) or medallions would be manufactured using the World Cup words and logo (*id.* ¶¶ 116–17).

3. During the previous Tournament in Italy in 1990, Cocepa—which had the comparable right to mint medallions commemorating the event there—did $20 million in sales (*id.* ¶¶ 116, 119).

4. In addition to the merchandising license, Time Warner controlled the premium license,[5] and royalties from sales of premiums to sponsors would more than equal the $1 million that Chicagoland would have to guarantee to obtain the exclusive license (*id.* ¶ 116).

Chicagoland also states that following those meetings, in May 1992 Obie met with Time Warner's Executive Vice President Ralph Irizarry ("Irizarry"), who further assured Obie that Chicagoland's medallion license would be exclusive and that Time Warner through its affiliate Warner Brothers would enforce the license both domestically and internationally (Obie Dep. 147–51).

Chicagoland then entered into negotiations with Time Warner (representing both World Cup Entities) to manufacture and market medallions bearing the World Cup logo for the Tournament. On July 14, 1992 Chicagoland signed forms of exclusive licensing agreements with each of the World Cup Entities (T.W. 12(M) ¶ 20),[6] although those agreements had not yet been signed by the latter (C. 12(N) ¶ 20).

On July 10, 1992 Chicagoland entered into a separate contract (the "Distribution Agreement") with Madison Avenue Sports Network ("Madison") to distribute Chicagoland's

---

2. Time Warner's GR 12(M) statements will be cited "T.W. 12(M) ¶ —" and Chicagoland's GR 12(N) statements will be cited "C. 12(N) ¶ —." Unless otherwise noted, each of those cited statements has been either explicitly or implicitly admitted in the corresponding response. Where Time Warner has disputed a Chicagoland GR 12(N) statement, the Time Warner version will be cited "T.W. R. ¶ —." Those same "T.W." and "C." abbreviations will be employed for the parties' other filings.

3. Chicagoland also goes by the name "Environmint" when marketing its medallions (T.W. 12(M) ¶ 4).

4. Time Warner disputes Chicagoland's contentions as to the substance of those meetings, but for purposes of this Rule 56 motion this Court must and does credit Chicagoland's version of those events.

5. "Premiums" are giveaways or items used as loss leaders to generate business (T.W. 12(M) ¶ 27).

6. This opinion will refer to the agreement with World Cup Domestic as the "Domestic Agreement," to the agreement with World Cup International as the "International Agreement" and to the two collectively as the "Licensing Agreements."

Tournament medallions internationally (T.W. 12(M) ¶ 32). One of the conditions of the Distribution Agreement was that Chicagoland obtain the exclusive worldwide rights from the World Cup Entities to manufacture, sell and distribute Tournament medallions (*id.* ¶¶ 33–34). Madison paid a $500,000 advance deposit and guaranteed that it would purchase at least $5 million in medallions (*id.* ¶¶ 36–37).

In August 1992 Obie learned of plans of the United States Mint ("Mint") also to issue coins commemorating the Tournament (C. 12(N) ¶ 155).[7] When Obie raised concerns about that development to Time Warner, Epner assured him that the Mint coins would be marketed only domestically and thus would not significantly affect Chicagoland's target of a primarily international market (*id.* ¶¶ 155–56). Obie further testified that "early on" he believed the Mint coins would be issued as circulating currency as opposed to commemorative non-circulating coins (*id.* ¶ 157;[8] Obie Dep. 575) Just a few months later Chicagoland also learned that several companies were marketing unlicensed medallions in Europe (C. 12(N) ¶ 183). Chicagoland promptly asked Time Warner to write those distributors to enforce Chicagoland's exclusive license (*id.* ¶¶ 183–95).

Chicagoland began to manufacture and sell Tournament medallions in November 1992 (C. 12(N) ¶ 47). Sometime between December 1992 and February 1993[9] the Domestic Agreement was returned to Chicagoland with several alterations, bearing not the signature of World Cup Domestic, the named licensor, but rather those of its two general partners, World Cup USA 1994, Inc. and ISM (Soccer), Inc. (T.W. 12(M) ¶ 41). In February 1993 the International Agreement was returned to Chicagoland, again with several altered pro-

visions but this time signed by World Cup International, the named licensor for that agreement (*id.* ¶ 43–46). Although Chicagoland never reexecuted the Domestic Agreement after the insertion of the unilateral changes, it did reexecute the International Agreement by signing on February 1, 1993 under the notation "Amendments to this Agreement agreed and accepted" and by returning the document to Time Warner on March 19, 1993 (*id.* ¶ 46; T.W.App. 425–26).

Throughout the first half of 1993 Chicagoland received more information about other competing medallions being marketed. It learned that additional European distributors were entering the market and that the Mint would market its coins internationally (C. 12(N) ¶¶ 188–89). Madison also informed Chicagoland that the words "World Cup" were considered part of the public domain in some places (T.W. 12(M) ¶ 81) and that Cocepa's 1990 sales were considerably less than the $20 million figure that Time Warner had originally conveyed (Obie Dep. 80–81). Chicagoland asserts that it repeatedly raised those matters with Time Warner, which continued to reassure Chicagoland as to each new problem either with promises of enforcement of the exclusive license or with denials of the reported information (see, e.g., C. 12(N) ¶¶ 188–89, 194).

In May 1993 Madison expressed serious concerns about the terms of the Distribution Agreement in light of (1) the emerging picture of apparent nonexclusivity of the license granted to Chicagoland and (2) the inaccurate information regarding Cocepa's 1990 performance (T.W. 12(M) ¶ 93). Then in August 1993 Madison and Chicagoland terminated the Distribution Agreement, with Chi-

---

**7.** T.W. R. 12(M) ¶ 155 disputes whether that was Obie's first inkling of the Mint's plans to issue Tournament coins. But for present purposes this Court must credit Obie's testimony about the August conversation that "it was at that point that I found out that the U.S. Mint was also doing coins, and I was very confused" (Obie Dep. 297).

**8.** T.W. R. 12(M) ¶ 157 quarrels with Obie's contention that he thought the Mint coins would be circulating money, asserting that such an idea "is so absurd that Obie could not possibly had [sic] so believed." While there may be reasons to

suspect the plausibility of Obie's version, Time Warner has done no more than to identify a factual dispute—it has not demonstrated that no reasonable jury could accept Obie's version of his initial understanding of the Mint's plan.

**9.** Chicagoland disputes the T.W. 12(M) ¶¶ 40–41 assertion that the signed Domestic Agreement was returned to it in December 1992. But Chicagoland does admit that by February 1993 it had the signed version in its possession, because it then gave both copies of the Licensing Agreement to its attorney Howard Turner (C. 12(N) ¶ 150).

cagoland being allowed to keep the $500,000 deposit (*id.* ¶¶ 94–95).

Meanwhile, in May 1993 Time Warner granted Chicagoland an extended schedule for making royalty payments under the International Agreement, which extension included a provision stating that "[i]n all other respects license agreement WC–4001 [the International Agreement] shall remain in full force and effect" and was signed by Obie (*id.* ¶ 96; T.W.App. 494). Later, in its efforts to find a replacement for Madison in late 1993 and 1994, Chicagoland exhibited the International Agreement to potential distributors to verify its exclusive license from World Cup International (*id.* ¶¶ 97–98). Although Chicagoland did eventually sell a number of medallions for the Tournament (*id.* 101; Lihota Aff. Table 8), it claims that "the competing medallions and coins, both from the U.S. Mint and various infringers, destroyed Chicagoland's marketing strategy based on limited editions of medallions" (C. Mem. 7).

### Fraudulent Inducement Claim

ACC Count V is entitled "Common Law Fraud" and alleges that Time Warner made false statements of material fact to Chicagoland upon which Chicagoland relied when it entered the Licensing Agreements, thereby suffering economic losses (ACC ¶¶ 72–75). Time Warner contends that even if it had made material misrepresentations—a contention that it posits only for purposes of making its waiver argument here—Chicagoland waived its claim of fraudulent inducement by not repudiating the Licensing Agreements after it learned of the assertedly false statements (T.W. Mem. 2–3).

Before this opinion turns to the merits of the parties' respective positions, it pauses briefly to identify the applicable substantive law. For cases sounding in diversity, the *Erie v. Tompkins* mandate to look to state law for the substantive rules of decision includes the application of the forum's choice of law doctrines (*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and its numerous progeny). Neither Time Warner nor Chicagoland speaks to that subject—instead each side's memoranda simply cite Illinois internal law. In that situation *Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir.1991) instructs

district courts to apply the substantive law of the forum. This opinion therefore applies Illinois law to the claims at hand.

Nearly 35 years ago *Eisenberg v. Goldstein*, 29 Ill.2d 617, 622, 195 N.E.2d 184, 186–87 (1963) addressed the issue of waiver in this way:

> A person who has been misled by fraud or misrepresentation is required, as soon as he learns of the truth, to disaffirm or abandon the transaction with all reasonable diligence, so as to afford both parties an opportunity to be restored to their original position. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of relief from the misrepresentations.

Time Warner seeks to rely on that language to assert that Chicagoland waived its fraud claim by not disaffirming the Licensing Agreements. But *Eisenberg*'s broadly-stated proposition has been narrowed considerably in the intervening decades, as courts applying the rule have fleshed out the appropriate considerations for determining when a litigant has waived its right to bring a fraud claim.

Thus the waiver doctrine was described in these terms in *Kaiser v. Olson*, 105 Ill. App.3d 1008, 1014, 61 Ill.Dec. 624, 629, 435 N.E.2d 113, 118 (1st Dist.1981) (citations omitted):

> It is a well-established principle that a person defrauded in a transaction may, by conduct inconsistent with an intention to sue for damages for fraud, waive the right to sue. Specifically, waiver will apply if a party, after discovering the alleged fraud and with full knowledge of its material aspects, engages in conduct which is inconsistent with an intention to sue. This is particularly true when the conduct engaged in affords the defrauded party an advantage or misleads or prejudices the opposite party. One is not permitted to lie back and speculate as to whether avoidance or affirmance of a contract will ultimately prove more profitable.

*Lee v. Heights Bank*, 112 Ill.App.3d 987, 995, 68 Ill.Dec. 514, 520, 446 N.E.2d 248, 254 (3d

Dist.1983) (emphasis in original) has added this critical factor to the *Kaiser* framework:

> An additional and essential element is that the injured party intend to affirm the contract *and* intend to abandon his right to recover damages for the loss resulting from the fraud. The added element of intent places a heavier burden upon the party asserting waiver. The mere passage of time or delay in bringing suit, without more, does not result in waiver. Without proof of intent, a party who relies on the statute of limitations and files his action within that time could unwittingly relinquish his right to sue through no fault of his own. Before we will permit such a result, the party who raises the defense of waiver must prove that the plaintiff intended to give up his right to sue.[10]

Our own Court of Appeals has had occasion to address the subject at length in a pair of decisions in *Havoco of Am., Ltd. v. Hilco, Inc.,* 731 F.2d 1282, 1287–92 (7th Cir.1984) (approving and following the *Lee* approach, and similarly distinguishing *Eisenberg,* after extended analysis) and 799 F.2d 349 (7th Cir.1986) ("*Havoco II*"). *Havoco II,* 799 F.2d at 353–54, quoting *Bankers Trust Co. v. Pacific Employers Ins., Co.,* 282 F.2d 106, 111 (9th Cir.1960) (other citations omitted), summarizes the matter in these terms:

> It is clear that under Illinois law, waiver can be implied from conduct. It is also clear that an essential element of waiver is that the injured party intended to affirm the contract and intended to abandon his right to recover damages. "If the intention to waive is implied from conduct, the

conduct should speak the intention clearly."

In order to prevail on its Rule 56 motion, then, Time Warner must show that there is no factual question as to whether Chicagoland intended to abandon its claim against Time Warner after it learned of the alleged fraud. To that end Time Warner Mem. 9–14 urges that Chicagoland waived its right to assert a fraudulent inducement claim because, even after it had knowledge of some of the license exclusivity problems—such as other coins being marketed in Europe and the Mint's plans to issue coins (at least domestically) (C. 12(N) ¶¶ 155, 183):

1. it returned the reexecuted International Agreement in March of 1993;

2. it agreed to an amended royalty payment schedule in May 1993 while affirming the remaining terms of the contract;[11]

3. it held the Licensing Agreements out to potential distributors when trying to solicit their business; and

4. it continued to exercise its license to manufacture medallions with the official World Cup words and logo.

■ In response, however, Chicagoland has raised a factual question as to whether a reasonable jury might decide despite those actions that Chicagoland did not intend to abandon its fraud claim. To that end Chicagoland has identified 14 specific instances that, in its view, raise concerns about the accuracy of Time Warner's representations. Here are those occasions:[12]

1. May 1992: Obie told Time Warner's President Ralph Irizarry ("Irizarry") that

10. [Footnote by this Court] *Lee, id.* also went on to explain that *Eisenberg* had been dealing with an effort to rescind an agreement assertedly entered into as a result of misrepresentations, so that the *Eisenberg* holding "is inapposite to actions at law for damages"—pointing out as well that *Eisenberg* had found no actionable fraud to be present there (as there was in *Lee,* and as a jury could reasonably find to have been involved here).

11. Neither party addresses why that amendment (T.W. App. 494) to the royalty payment schedule was signed by Time Warner and Chicagoland, but not by World Cup International, despite this provision in the International Agreement (*id.* at 443):

> No alteration, amendment or modification hereof shall be valid, unless executed by an instrument in writing by the parties hereto with the same formality as this Agreement. But whether or not the amendment was properly executed pursuant to the International Agreement (or possibly through some oral modification of the quoted provision) will not affect this opinion's analysis of Time Warner's claim. Chicagoland's signing of the document conveys the same information about Chicagoland's intentions irrespective of whether the amendment was otherwise enforceable.

12. While Time Warner disputes the facts underlying many of the assertions, they are sufficiently supported in the record to raise factual issues for purposes of this Rule 56 motion.

Chicagoland was worried about other medallions. Irizarry responded that Time Warner had the ability to police its exclusive license worldwide, saying "nobody fucks with Time Warner" (C. 12(N) ¶¶ 125–27).

2. August 1992: Upon learning that the Mint planned to issue Tournament commemorative coins, Obie complained to Epner that the Mint's plan would violate the Licensing Agreements. Epner responded that the Mint's coins would be marketed only in the United States and that Time Warner could still control the overseas market on behalf of Chicagoland (*id.* ¶ 155).

3. Approximately November 1992: Obie asked Time Warner to send enforcement letters to a list of distributors of unlicensed medallions in Germany. Time Warner sent the letters on December 2, 1992 (*id.* ¶¶ 183–87).

4. February 1993: After learning that the Mint coins would be marketed overseas as well as domestically, Obie complained again to Epner, who responded that it was a political problem and that he was working on it (*id.* ¶ 188).

5. April or early May 1993: After receiving a letter from Madison on April 28, Obie confronted Time Warner with the information that "World Cup" was considered in the public domain in Germany, to which Epner responded that it was not and that it could be enforced as a trademark (*id.* ¶ 81).

6. May 1993: Obie spoke to Epner about the claim that Cocepa's 1990 Tournament sales were much lower than Time Warner's $20 million representation. Epner assured Obie that Time Warner could provide documentation of the $20 million figure (*id.* ¶¶ 89–90).

7. May or June 1993: After Epner left Time Warner in mid-May, Obie spoke with Todd Schindler ("Schindler"), the head of Time Warner's international sales and marketing operation, about the same Cocepa issues. Schindler responded that he would try to get the appropriate documentation (*id.*).

8. May 20, 1993: Obie wrote Joseph Grant at Time Warner and complained of two specific European distributors market-ing unlicensed medallions that threatened Chicagoland's marketing strategy (*id.* ¶ 191).

9. September 1993: When Time Warner requested that Chicagoland make delinquent royalty payments, Obie protested that Time Warner had not been protecting the marks overseas. Irizarry told Obie that the Licensing Agreement terms could be renegotiated once the Tournament was over (*id.* ¶¶ 206–07).

10. October 18, 1993: Obie wrote Schindler detailing the problems with European infringers and stating (*id.* ¶ 209; C. Ex. 13):

WE CAN NOT COMPETE IN THE MARKET PLACE WITH ALL OF THE KNOCK OFF PRODUCTS. WE NEED YOU TO PROTECT OUR RIGHTS! FAILURE TO PROTECT OUR RIGHTS WILL RESULT IN SEVERE FINANCIAL LOSSES!

We need to resolve these issues immediately. If they can not be resolved we will not be able to meet our guarantee. You have to help us!

11. December 13, 1993: Obie wrote Tammy Bloom, a Time Warner attorney involved in trademark enforcement, that Chicagoland had lost part of an order for coins due to advertisements in Europe for coins by Cocepa (C. 12(N) ¶ 212).

12. January 18, 1994: In response to a letter from Time Warner updating Chicagoland about Time Warner's enforcement measures, Obie wrote back to Time Warner detailing the various ongoing license violation problems and concluding (*id.* ¶ 213; C. Ex. 27):

I have suffered substantial financial damages. All the measures taken by TWSM and World Cup have not stopped any company from marketing knock-off World Cup medallions. Your office in Milan can not even police its own city. Why is it that I turn in the European infringers from Chicago and TWSM in Italy does not even stop its own licensees (Concepa [sic]) from infringing on us?

13. February 14, 1994: Obie and another Chicagoland representative met with Schindler. When Obie said that he was upset about Time Warner's earlier false

statements regarding the potential market, Cocepa and the Mint, Schindler responded that they would later work out a financial modification of the Licensing Agreements but that for then the parties should "wait and see" (C. 12(N) ¶ 217).

14. Summer 1994: During the Tournament, Obie told Time Warner that he thought they had sold him "a bag of air" (*id.* ¶ 218).

Those ongoing communications between Time Warner and Chicagoland operate in two ways to enable Chicagoland to survive summary judgment on the waiver issue. Identifying those two analytical roadblocks to Time Warner's motion does not require much amplification.

To begin with, in the earlier part of the time frame-through the first half of 1993 when Chicagoland signed the affirmations of the International Agreement—a jury could surely find that it was reasonable for Chicagoland to have relied on Time Warner's assurances that the specific problems could and would be controlled. There is a material question of fact as to whether Chicagoland knew or had reason to know at the time of those reaffirmations that Time Warner's earlier representations would necessarily prove to be false.

Secondly, throughout the time frame Chicagoland's pattern of behavior can certainly be viewed as evidencing a lack of intent to abandon its claim, as required by *Lee,* 112 Ill.App.3d at 995, 68 Ill.Dec. at 520, 446 N.E.2d at 254. Chicagoland regularly raised its complaints, never letting more than a few months pass without getting back to Time Warner when Time Warner's several reassurances failed to come to fruition. And the tenor of Chicagoland's later communications reflects a rising level of frustration and dissatisfaction on Chicagoland's part, with Obie ultimately telling Time Warner that it had sold him "a bag of air." Those actions could plainly be found to be consistent with a desire to pursue a claim of fraud and a lawsuit advancing that claim, even without a formal disaffirmation of the contracts.

There is more as well. From a policy standpoint, the facts do not trigger *Kaiser*'s concerns about assertedly defrauded parties being permitted to mislead or prejudice their adversaries (*Kaiser,* 105 Ill.App.3d at 1014, 61 Ill.Dec. at 629, 435 N.E.2d at 118). Chicagoland can scarcely be described as having misled Time Warner. It repeatedly told Time Warner about its dissatisfaction with the developing situation as to the non-exclusivity of the license and as to the 1990 Tournament sales. And an internal Time Warner memo dated August 8, 1994 (seven months before Time Warner filed this suit, followed by Chicagoland's original filing of its counterclaim) shows that Time Warner was well aware that the situation would likely end in litigation and that Chicagoland would likely claim that the trademark problem caused its inability to meet its guaranty (C. 12(N) ¶ 221; C. Ex. 42).

Furthermore, Time Warner cannot claim that it was surely prejudiced by Chicagoland's actions before the latter brought its fraud claim. There is a sharp contrast between the situation here and that of the defrauded party in *Kaiser* who "controlled and managed the business until it became insolvent," thereby engaging in what the *Kaiser* court considered "speculation which caused a diminution of the value of the property in their hands which would prejudice the sellers" (105 Ill.App.3d at 1015, 61 Ill.Dec. at 630, 435 N.E.2d at 119). Here Chicagoland was clearly not in control of the Tournament medallion situation. To the contrary, other manufacturers and distributors were nosing into the market, some of them with the actual consent of the World Cup Entities and Time Warner. That of course is the very premise of Chicagoland's claim: It was not getting the benefit of the exclusive license arrangement that it claims Time Warner initially extended. Time Warner then is hard-pressed to assert that it was prejudiced by Chicagoland's continued performance of its part of the Licensing Agreements, let alone Time Warner's being able to claim the absence of a factual issue in that regard.[13]

---

**13.** Indeed, if Chicagoland had *not* continued to perform, it would have been at peril of facing arguments by Time Warner (and at that time by the World Cup Entities as well) that it had breached its own contractual obligations—or as to Chicagoland's own claim, that it had failed to mitigate its damages. Any argument by Time Warner based on alleged prejudice would thus pose a Catch-22 situation for Chicagoland.

In sum, Chicagoland is successful in averting summary judgment by raising questions of material fact as to its knowledge of the alleged fraud and as to whether its actions were inconsistent with an intention to pursue a lawsuit, thus causing Time Warner to be misled or prejudiced. Count V will therefore proceed to trial.

### Remaining Claims

Chicagoland has also brought four other still-pending claims against Time Warner.[14] This opinion will address them in the order that they appear in the ACC.

Count II is a breach of contract claim that asserts Time Warner must be liable to Chicagoland as an unauthorized agent if Time Warner had lacked the authority to bind the World Cup Entities to the Licensing Agreements (ACC ¶ 60). In light of the settlement agreement reached between Chicagoland and the World Cup Entities (including settlement of a claim to which Count II was an alternative pleading), and absent any word to the contrary from the litigants in their current briefing, this Court assumes that Count II is now defunct and therefore dismisses it.

Count III alleges that Time Warner and Chicagoland entered into an additional contract separate from the Licensing Agreements, under which Chicagoland agreed to be the exclusive licensee for Tournament medallions in exchange for Time Warner's (ACC ¶ 62):

1. preventing the circulation of other Tournament coins or medallions;

2. ensuring that all premiums by sponsors were purchased through Chicagoland; and

3. using its network to help promote Chicagoland's medallions.

It takes only a moment's thought to see that such a claim appears to bring the Illinois statute of frauds into play (740 ILCS 80/1):

No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or

agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

If Time Warner and Chicagoland had indeed reached such an agreement, its performance would necessarily have taken more than one year because it would have been made in 1992 and by definition had to last through the 1994 Tournament. From the recitation of facts in the ACC and the parties' current memoranda, that agreement (if made) was oral rather than being put into writing. That being so, the statute of frauds would render the agreement unenforceable so that Count III should also be dismissed.

There is one possible fly in Time Warner's statute of frauds ointment: the possibility of forfeiture of that defense. Although it included that contention as a one-sentence third affirmative defense [15] in its reply to the ACC (thus eliminating the potential for a ruling that it had waived or forfeited the defense under the direct line of analysis just set out in *Venters v. City of Delphi*, 123 F.3d 956, ——, 1997 WL 471341, at *7–*8 (7th Cir.1997)), its original Rule 56 motion papers totally omitted any such contention. And it is of course obvious that a party opposing a summary judgment motion has no obligation to offer something affirmative to defeat an element that is essential to the proponent's claim or defense but that the proponent has not addressed in its own moving papers (cf. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53). It was not until Time Warner's R. Mem. 14 (the final scheduled brief in the summary judgment sequence) that it said a word to advance that argument. Then when Chicagoland complained about that assertion of new matter by moving to strike portions of Time Warner's Reply Memorandum, Time Warner's March 14, 1997 responsive memorandum was totally silent on that subject, except to state without supporting authority that "[i]t was a proper argument" to make in

---

**14.** Counts I and VII were dismissed earlier as a result of the settlement agreement between Chicagoland and the World Cup Entities.

**15.** That affirmative defense simply said:

Insofar as the counterclaim is based upon one or more alleged oral agreements between the parties, such oral agreements are invalid and unenforceable under the applicable statute of frauds.

reply to a contention that it had known Chicagoland was asserting all along—but that, it is worth repeating, Time Warner had never challenged in its opening-gun Rule 56 submission.[16]

Under those circumstances this opinion will reserve final ruling on Count III until the status hearing set at the conclusion of this opinion. On or before September 12, 1997 the parties are directed to file in this Court's chambers citations to any relevant authority bearing on the forfeiture or waiver of Time Warner's statute of frauds argument (or Chicagoland may tender some proof of a written version of the agreement that satisfies the statute of frauds in any event). This Court will then determine whether Count III will also be dismissed.

■ Count IV is a promissory estoppel claim in which Chicagoland alleges that it detrimentally relied on representations and warranties made by Time Warner (ACC ¶¶ 69–70). Again Time Warner has raised the statute of frauds in the same reply memorandum (R. Mem. 14).[17] Illinois law has been unsettled as to whether promissory estoppel claims are subject to the statute of frauds (see the discussion in *Genin, Trudeau & Co. v. Integra Dev. Int'l,* 845 F.Supp. 611, 616–19 (N.D.Ill.1994) and cases cited there). But the more recent trend is to apply the statute to such claims.

Thus *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.,* 58 F.3d 1227, 1231 (7th Cir.1995) has retreated from our Court of Appeals' earlier prediction [18] that Illinois would exclude such claims from the statute of frauds:

We adhere to the view tentatively adopted in *Goldstick v. ICM Realty,* 788 F.2d 456,

464–66 (7th Cir.1986), and since confirmed (as a prediction of Illinois law) by two decisions of the Illinois Appellate Court, *First National Bank v. McBride,* 267 Ill. App.3d 367, 204 Ill.Dec. 676, 680, 642 N.E.2d 138, 142 (1994); *Dickens v. Quincy College Corp.,* 245 Ill.App.3d 1055, 185 Ill. Dec. 822, 827, 615 N.E.2d 381, 386 (1993), that the statute of frauds is applicable to a promise claimed to be enforceable by virtue of the doctrine of promissory estoppel.

And Illinois' First District Appellate Court—which this Court must follow while sitting in diversity pursuant to *Klaxon* and the Illinois Supreme Court's directive in *State Farm Fire & Cas. Co. v. Yapejian,* 152 Ill.2d 533, 539–40, 178 Ill.Dec. 745, 748, 605 N.E.2d 539, 542 (1992) [19]—has concluded in *Cohn v. Checker Motors Corp.,* 233 Ill.App.3d 839, 845, 175 Ill.Dec. 98, 103, 599 N.E.2d 1112, 1117 (1st Dist.1992) that promissory estoppel, unlike equitable estoppel discussed below, falls within the ambit of the statute of frauds. So if Chicagoland's claim were limited to the elements of promissory estoppel, the statute of frauds defense would be properly invoked.

■ Time Warner is not out of the woods, however, in light of Count IV's qualification as an equitable estoppel claim. As made clear in *Cohn,* 233 Ill.App.3d at 845, 175 Ill.Dec. at 103, 599 N.E.2d at 1117:

[I]n order to trump the statute of frauds, a party must invoke the doctrine of equitable estoppel, which differs from promissory estoppel in that the party asserting it must additionally allege words or conduct amounting to a misrepresentation or concealment of material facts.

Here Count IV incorporates numerous factual allegations of misrepresentations by Time

---

**16.** Understandably Chicagoland's Surreply Memorandum, which this Court then granted leave to file, addressed only the matters substantively covered in Time Warner's March 14 response, but not the unsupported statute of frauds statements.

**17.** That being so, what has already been said as to the possibility of a waiver or forfeiture by Time Warner regarding Count III would also apply to Count IV—even apart from what follows in the text.

**18.** See *R.S. Bennett & Co. v. Economy Mechanical Indus., Inc.,* 606 F.2d 182, 187–88 (7th Cir. 1979).

**19.** For a more extended recent discussion of the interaction between *Klaxon* and *State Farm,* see this Court's opinion in *Systemax, Inc. v. Schoff,* 972 F.Supp. 439 (N.D.Ill.1997). Here Chicagoland has its principal place of business in Mount Prospect, situated in Illinois' First Appellate District, and the parties have raised no other significant Illinois contacts (T.W. 12(M) ¶ 1). If the case had been filed in an Illinois state court, then, precedent from the First Appellate District would control. And under *Erie* this Court must and will deliver the same substantive justice to the litigants as its state court counterpart would.

Warner, including its overstating the amount of Cocepa's 1990 Tournament sales and its falsely assuring Chicagoland that it would have an exclusive license for Tournament medallions protected by Time Warner's enforcement capabilities (ACC ¶¶ 12–13, 71). Therefore, despite its promissory estoppel heading,[20] this Court will treat Count IV as arising under the equitable estoppel doctrine.

 *Gold v. Dubish,* 193 Ill.App.3d 339, 347–48, 140 Ill.Dec. 9, 13, 549 N.E.2d 660, 664 (5th Dist.1989) describes that doctrine:

> While promissory estoppel requires proof of an unambiguous promise, equitable estoppel does not. Equitable estoppel is a doctrine that is invoked to prevent fraud and injustice; the test is whether, considering all the circumstances of the specific case, conscience and honest dealing require that a party be estopped. Equitable estoppel may arise whenever a party, by his word or conduct, reasonably induces another to rely on his representations, and leads another, as a result of that reliance, to change his position to his injury.

*Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.,* 114 Ill.2d 133, 148, 102 Ill.Dec. 379, 385, 500 N.E.2d 1, 7 (1986), quoting *Beynon Bldg. Corp. v. National Guardian Life Ins. Co.,* 118 Ill.App.3d 754, 763, 74 Ill.Dec. 216, 222, 455 N.E.2d 246, 252 (2d Dist.1983), elaborates:

> To invoke the doctrine of estoppel the representation or conduct need not be "fraudulent in the strict legal sense or done with an intent to mislead or deceive." Rather, the test is "whether in all the circumstances of the case conscience and [the] duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct." In the absence of such conduct the party changing his position must be said to have acted solely upon his own judgment and at his own risk.

As discussed earlier, Chicagoland has raised questions of material fact about whether it reasonably relied on misrepresentations by Time Warner. But T.W. R. Mem. 14 additionally challenges whether Chicagoland detrimentally relied on that information "in light of the profitability of its deal with MASN [Madison] in particular, and on the World Cup medallion program as a whole."

 That position, however, appears to assume that a party's loss of profits does not qualify for detrimental reliance treatment in promissory (or equitable) estoppel cases. On that score, however, *Gold,* 193 Ill.App.3d at 350–51, 140 Ill.Dec. at 15, 549 N.E.2d at 666 (citation omitted) is clear:

> It has been recognized in this State that an award of damages based on lost profits may be appropriate in a promissory estoppel case when such an award is necessary in order to do complete justice. Although plaintiffs have not cited and we have not found any Illinois decisions which have considered the matter, we believe that the same rule should apply where the cause of action is predicated upon equitable estoppel.

 Here Chicagoland has asserted that in reliance on Time Warner's misrepresentations it executed an exclusive Distribution Agreement with Madison under which Chicagoland stood to make $3 million in profits (ACC ¶ 30; C. 12(N) ¶¶ 141–43). Then, when Madison learned of the nonexclusivity of the license and the misinformation about Cocepa, not only did it want to get out of the Distribution Agreement, but it further threatened to bring a consumer fraud claim against Chicagoland and to stall arbitration so that Chicagoland could not take over the distribution of medallions in Europe (C. 12(N) ¶¶ 183–99).[21] Chicagoland also other damages calculations in which it asserts, based on European sales of other allegedly infringing distributors such as the Mint and

---

**20.** Federal courts are not constrained by the tyranny of labels, so they may treat a mislabeled motion or claim as its substantive equivalent (see, e.g. *International Business Lists, Ltd. v. AT & T,* 878 F.Supp. 102, 105 (N.D.Ill.1994) and cases cited there). That principle as to the misidentification of a claim has most recently been reconfirmed by our Court of Appeals in *Albiero v.*

*City of Kankakee,* 122 F.3d 417, 418–19 (7th Cir.1997).

**21.** While Time Warner disputes several of those C. 12(N) statements, the statements are sufficiently supported in the record to create issues of fact.

Cocepa, that it would have profited between $3 million and $5 million (C. 12(N) ¶ 234). According to Time Warner's calculations, Chicagoland's actual cumulative gross profits were less than $1 million (Lihota Aff. Table 8). Those circumstances certainly might, in the eyes of a reasonable jury, demonstrate detrimental reliance. Chicagoland accordingly survives summary judgment as to Count IV.

Lastly, Chicagoland advances Count VI as a claim under Illinois' Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2). Because Time Warner does not specifically address that claim, it too will proceed to trial.

One final point should be made about Time Warner's response to Chicagoland's claims dealt with in this opinion. T.W. Mem. 14–15 and T.W. R. Mem. 13 contend that Chicagoland's claims are barred by the Licensing Agreements' exculpatory clauses—clauses that say Chicagoland will be limited to seeking liability from the World Cup Entities and that Time Warner will not "incur any financial responsibility or liability of any kind or nature whatsoever in connection with or arising out of this Agreement, express or implied, written or oral" (T.W. App. 423, 473).[22] Several problems exist with that assertion.

As an initial matter, Chicagoland has raised a material question of fact as to whether the Domestic Agreement was ever properly executed, because it was materially altered after it was signed by Chicagoland, it was never signed by World Cup Domestic itself and it was not re-executed by Chicago-

land (C. Mem. 14; C. 12(N) ¶ 40). And although Chicagoland arguably later treated the Domestic Agreement as though it were in effect, this opinion has earlier held that Chicagoland has raised a material question of fact as to whether those actions were taken in reliance on misrepresentations by Time Warner and therefore do not indicate an intent to ratify the Domestic Agreement.

Chicagoland raises similar execution problems as to the International Agreement, including a question as to whether World Cup International approved the inclusion of Time Warner's name in the exculpatory clause after World Cup International had deleted it (C. Mem. 5–6; C. 12(N) ¶ 43). Although those execution glitches were arguably resolved when both Chicagoland and World Cup International reexecuted the agreement as amended in January and February 1993 (T.W. App. 426), Chicagoland still claims that it was fraudulently induced to sign both the original draft and the amended version and then to ratify the contract via the modification of royalty payments.[23]

■ Most importantly, however, still another (and this time dispositive) difficulty is faced by Time Warner's attempted invocation of the exculpatory clauses. Although it is well established that a party seeking fraudulent inducement relief may elect to rescind the contract and obtain restitution or to affirm and sue for damages (see, e.g., *Sciarabba v. Chrysler Corp.*, 173 Ill.App.3d 57, 122 Ill.Dec. 870, 527 N.E.2d 368 (1st Dist.1988)), any flip-side notion that the party seeking

---

**22.** Time Warner, not having been a party to the Licensing Agreements, must raise the exculpatory clauses as a third-party beneficiary. That standing issue poses no problem, because Time Warner—having been specifically named in those documents—was plainly intended to receive a benefit from their provisions.

**23.** C. Mem. 14 also suggests that Chicagoland's reexecution of the International Agreement is "negated by the indisputable economic duress" that it was under at the time, described in these terms at C. Mem. 10:

> Chicagoland received the substantially altered forms of the international licence agreements at a time when it could no longer terminate the relationship with World Cup without being both prejudicial to its interests and commercially unreasonable.

But that type of financial pressure does not equate to duress as defined in such Illinois cases as *Carlile v. Snap–On Tools*, 271 Ill.App.3d 833, 840, 207 Ill.Dec. 861, 866, 648 N.E.2d 317, 322 (4th Dist.1995) (citations omitted).

> Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances depriving him of the exercise of free will.... Nor does the defense of duress exist where consent to an agreement is secured because of mere hard bargaining or the pressure of financial circumstances.

Thus Chicagoland has not identified any factual predicate for finding its circumstances to have been so dire as to support a defense of legal duress.

damages automatically affirms the contract would lead to an inequitable result here. If Chicagoland were to be viewed as necessarily affirming the International Agreement's exculpatory clauses by suing Time Warner in fraud, that would also amount to affirming the very instrument that arguably bars the fraudulent inducement suit itself—plainly an illogical result when, as this opinion has found, Chicagoland has otherwise satisfied all of the elements of a fraud claim for summary judgment purposes.

■ In a roughly analogous situation where a party charged with fraudulent inducement sought to invoke a clause in the contract barring rescission as a remedy, *Kleinwort Benson N. Am., Inc. v. Quantum Fin. Servs., Inc.*, 285 Ill.App.3d 201, 216, 220 Ill.Dec. 457, 467, 673 N.E.2d 369, 379 (1st Dist.1996) held that any such application would violate public policy and accordingly found the clause void "insofar as it purports to limit . . . liability for fraud" by the plaintiff attempting to call the exculpatory clause to its aid. Illinois law is clear that exculpatory clauses are not enforceable to insulate a party against responsibility for its own intentional torts—most particularly fraud. *Kleinwort* expressly followed the decision in *Zimmerman v. Northfield Real Estate. Inc.*, 156 Ill.App.3d 154, 165, 109 Ill.Dec. 541, 547, 510 N.E.2d 409, 415 (1st Dist.1986) (citations omitted), which provides a succinct statement of that well-settled proposition:

> An exculpatory clause cannot protect persons from the results of their wilful and wanton misconduct. Such a contractual shield is illegal. We have found that count I sufficiently states a cause of action for fraud which is an intentional tort. Thus, the exculpatory clause in the present case would not shield defendants from liability for fraud.

■ When the facts here are viewed in the light most favorable to Chicagoland, Time Warner's behavior can also be found "wilful and wanton misconduct"—how else can such deliberate fraud be characterized? In those terms, to the extent that the Licensing Agreements' exculpatory clauses purport to bar Chicagoland's remaining claims—each of which is based on allegedly intentional misrepresentations upon which Chicagoland relied—those clauses must be deemed void if Chicagoland prevails on its substantive contention of fraud.

### Conclusion

Chicagoland has raised material factual questions about (1) whether it had adequate notice of Time Warner's alleged fraud when it reaffirmed the Licensing Agreements in March and May of 1993 and (2) whether it acted consistently with an intention to pursue a fraud suit even after having notice of the misrepresentations. Chicagoland therefore cannot be said here to have waived its fraudulent inducement claims as a matter of law, and Time Warner's Rule 56 motion as to Count V is denied. That claim will accordingly proceed to as prompt a trial as possible. This action is set for a status hearing at 9 a.m. September 18, 1997 to discuss the swift conclusion of the litigation.

As for the remaining claims, Count II is dismissed because it was an alternative pleading to a previously settled and dismissed claim and was raised by neither party here. Count III, based on an alleged oral contract between Time Warner and Chicagoland, may or may not also be dismissed at the September 18 status hearing, depending on the September 12 submissions by the parties on the issues set out in this opinion. As to Count IV (which will be henceforth treated as a equitable estoppel claim), Time Warner's Rule 56 motion is denied. Its motion is also denied as to Count VII, Chicagoland's consumer fraud claim. Both of those claims will also proceed to trial.