2023 IL App (4th) 220801
NO. 4-22-0801
IN THE APPELLATE COURT
OF ILLINOIS
FOURTH DISTRICT

FILED
October 5, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| NYLE F. ANDERSON and ANDERSON WILKINS LOWE LIFE INSURANCE BROKERS, INC., | ) ) | Appeal from the Circuit Court of |
| Plaintiffs and Counterdefendants-Appellees, | ) ) | Whiteside County No. 10CH93 |
| v. | ) | |
| FRANK C. NELSEN, | ) | Honorable |
| Defendant and Counterplaintiff-Appellant. | ) ) | Stanley B. Steines, Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Cavanagh and Lannerd concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff/counterdefendant Nyle F. Anderson owned and operated several businesses with defendant/counterplaintiff Frank C. Nelsen, including plaintiff Anderson Wilkins Lowe Life Insurance Brokers, Inc. (AWL). They also owned and operated Forty Below, Inc. (Forty Below); Prep Sports Online (PSO); Prep Sports, Inc. (PSI); and Moriah Management, Inc. (Moriah Management). Anderson and AWL filed a complaint against Nelsen asserting, *inter alia*, claims of tortious interference with a business expectancy, fraud, and breach of fiduciary duty. Nelsen filed a counterclaim against Anderson asserting, *inter alia*, claims of breach of fiduciary duty.

¶ 2        More than 10 years after the litigation commenced, by agreement of the parties, the matter proceeded to what the parties termed a "concurrent bench-jury trial." The jury was

tasked with adjudicating Anderson's claims of tortious interference with a business expectancy and fraud, and the trial court was to adjudicate the parties' claims of breach of fiduciary duty. The jury found Nelsen liable for both tortious interference with a business expectancy and fraud, awarding Anderson compensatory damages in the amount of $3,236,000 and punitive damages in the amount of $2.5 million. The court subsequently denied all the parties' claims of breach of fiduciary duty, finding the claims were barred by the unclean hands doctrine.

¶ 3        Nelsen appeals, arguing that the trial court erred by denying his motion to disqualify counsel and failing to grant a new trial because he was adversely affected by attorney Daniel Konicek's dual representation of AWL and Anderson while allegedly laboring under a concurrent conflict of interest. Nelsen also argues the court erred by failing to grant a new bench trial because it abused its discretion by *sua sponte* ruling that the parties' claims of breach of fiduciary duty were barred by the unclean hands doctrine. Additionally, Nelsen contends the court erred by failing to enter judgment *non obstante veredicto* (*n.o.v.*) on the portions of the jury's verdict awarding damages for lost benefits, damage to credit, and emotional distress. Finally, Nelsen contends the court abused its discretion by denying his motion for a remittitur of punitive damages. We affirm in part, reverse in part, and remand with directions.

¶ 4                                I. BACKGROUND

¶ 5                                A. The Pleadings

¶ 6        On May 10, 2010, Anderson filed a "Complaint for Accounting" against Nelsen. Thereafter, Anderson filed five amended versions of his complaint. The fifth amended complaint, filed February 2, 2016, was brought by Anderson individually and by Bruce Breitweiser in his capacity as court-appointed receiver for AWL, Moriah Management, and Forty Below. The fifth amended complaint asserted on behalf of AWL, among other claims, claims for

- 2 -

breach of fiduciary duty and conversion. On behalf of Anderson, the fifth amended complaint set forth claims of (1) breach of fiduciary duty, (2) tortious interference with a business expectancy, and (3) fraud. These claims were based on allegations that Nelsen overpaid himself and concealed it from Anderson; directed insurance companies to pay commissions to him personally instead of AWL and concealed it from Anderson; transferred AWL funds into his personal accounts and concealed it from Anderson; falsely told Anderson that AWL and their other companies were not operating at a profit and could no longer pay Anderson's salary; prevented Anderson from accessing AWL corporate financial information and records; and engaged Anderson in litigation to attempt to remove him as an owner, director, and officer of AWL.

¶ 7        Nelsen filed a counterclaim and subsequently amended it twice. Nelsen's second amended counterclaim, filed March 27, 2013, contained several claims, including claims that Anderson breached his fiduciary duty to Nelsen in various ways. Relevant to this appeal, Nelsen claimed Anderson breached his fiduciary duty to Nelsen by (1) concealing and misrepresenting the terms of PSI's agreement with Wasserman Media Group, LLC (Wasserman Group), and (2) refusing to pursue collection of debts owed to AWL and Forty Below by Anderson, PSO, PSI, and PSO Photo, a company Anderson formed without Nelsen's involvement.

¶ 8                    B. Pretrial Rulings

¶ 9        Initially, both Anderson and Nelsen claimed they owned 100% of AWL. However, in March 2017, the trial court entered an order on the parties' cross-motions for partial summary judgment determining they each owned 50% of AWL.

¶ 10        In 2012, the trial court entered an agreed order appointing Breitweiser as the receiver for AWL, Forty Below, and Moriah Management. On June 26, 2017, Breitweiser filed a motion for leave to decline further pursuit of litigation in the case. Breitweiser asserted he

intended to allow any further pursuit of a claim in the litigation to be made on a derivative basis by either Anderson or Nelsen based on their positions as shareholders and owners of AWL. The court granted the motion. Breitweiser was discharged as receiver in August 2018.

¶ 11 The trial was set to commence on June 15, 2021. On June 7, 2021, Konicek entered his appearance as an additional attorney for Anderson and AWL. Konicek had previously, at various times during the case, represented Anderson and Breitweiser. Nelsen filed a motion to disqualify Konicek, alleging that Konicek's representation of Anderson was barred because he formerly represented Breitweiser, who was expected to testify at the trial. The trial court denied the motion.

¶ 12 Nelsen filed a motion *in limine* requesting admission by judicial notice of proofs of claim filed by Breitweiser in Anderson's 2017 bankruptcy case. The motion alleged the proofs of claim, which were filed in February 2018, asserted that Anderson owed sums of money to AWL and Forty Below due to his failure to repay loans the companies made to him and to entities controlled by him. The trial court denied the motion *in limine* but indicated the parties were not precluded from asking questions about the documents, requesting that they be admitted for a limited purpose, or questioning Breitweiser about his efforts to collect the loans.

¶ 13                                    C. Trial

¶ 14 On November 16, 2020, the trial court entered an order stating that, by agreement of the parties, their claims would be heard at a "concurrent bench-jury trial during which the Court and the jury [would] sit simultaneously and hear all the evidence presented by the parties." At this "concurrent bench-jury trial," Anderson's, AWL's, and Nelsen's claims of breach of fiduciary duty were to be "heard and adjudicated by the Court." Anderson's claims based on tortious interference with a business expectancy and fraud were to be decided by the jury. The

- 4 -

parties ultimately did not proceed with the other claims alleged in the fifth amended complaint and second amended counterclaim, including AWL's claim for conversion.

¶ 15                                 1. *The Parties' Business Relationships*

¶ 16            The evidence at the trial showed that Anderson and Nelsen were formerly best friends and business partners. Anderson formed AWL, a company that sold life and health insurance, in 1981 with James Wilkins and David Lowe. Anderson had been president of the company and a 50% shareholder since it was founded. AWL hired Nelsen to sell insurance products in 1983, and Nelsen became a director of the company in 1985. In 1994, Wilkins and Lowe retired and sold their stock back to AWL. At that time, Nelsen became the secretary of AWL, began managing AWL's financial affairs, and, according to Nelsen, became a 50% owner.

¶ 17            Between approximately 2000 and 2003, Anderson and Nelsen started several new businesses: Forty Below, PSI, PSO, and Moriah Management. PSI was a for-profit corporation that built high school sports websites, and PSO was a related not-for-profit organization. Forty Below was a Dippin' Dots franchise. Moriah Management was an employee leasing company. When Moriah Management was founded, all the people working for AWL, Forty Below, and PSI became employees of Moriah Management, which made it easier to purchase group health insurance. Nelsen and Anderson each owned 50% of PSI, Forty Below, and Moriah Management. They started Forty Below, PSI, and PSO using money borrowed from AWL.

¶ 18                                 2. *Nelsen's Testimony as an Adverse Witness*

¶ 19            At the trial, Anderson called Nelsen as an adverse witness. While we primarily summarize Nelsen's testimony as an adverse witness in this section, we also include some of his later testimony given in his case-in-chief. Nelsen testified that, starting in 2001, he received a salary of approximately $3500 per month. He indicated that he and Anderson would also

frequently receive bonuses if either of them "needed something for a personal reason." They would agree to these bonuses during informal conversations. At some point before 2008, Nelsen reduced his salary and bonuses.

¶ 20 Nelsen identified plaintiff's exhibit No. 140 as an accurate summary of his tax returns from 1996 through 2012 that had been prepared by his attorney, and it was admitted into evidence. The document indicated Nelsen's W-2 income from AWL and Moriah Management ranged from $93,938.11 to $169,306 per year between 1996 and 2007. From 2008 through 2012, his W-2 income ranged from $36,061 to $61,883 per year. On his Schedule C tax forms, he reported receiving gross income from a sole proprietorship starting in 1996. The gross income from the sole proprietorship reported on Nelsen's Schedule C form ranged from $17,966 to $977,333 per year between 2002 and 2007, and from $30,604 to $402,476 per year between 2008 and 2012. In 2007, Nelsen reported he received $153,304 in W-2 income, and his sole proprietorship received $977,333 in gross income.

¶ 21 Nelsen later testified that the $977,333 he reported on his Schedule C form in 2007 was deposited back into AWL. Nelsen testified he had previously made a sworn statement that he did not form a sole proprietorship until after he resigned from AWL in July 2012, but he stated his tax returns reported gross income from a sole proprietorship beginning much earlier. Also, while Nelsen initially testified that plaintiff's exhibit No. 140 was an accurate summary of his tax returns, he later indicated that some of the W-2 income attributed to him on that exhibit was actually his wife's income from her employment as a nurse. He did not specify how much of this income was generated by his wife, and he did not know if the W-2 income reported from 2008 through 2012 was just his or included his wife's income.

¶ 22        Nelsen testified he filled out paperwork to have several insurance companies pay commissions and other payments to him directly rather than AWL. He directed a company called Coventry to make payments directly to him rather than AWL in 2007, and he informed Anderson about it. He directed several other companies to pay commissions to him directly between 2010 and 2012, but he did not tell Anderson he had done so on these occasions. The forms reflecting Nelsen's payment directions were admitted into evidence.

¶ 23        Nelsen acknowledged that, in September 2010, the trial court entered a preliminary injunction against Anderson, which prohibited him from being involved in AWL. At that time, Nelsen had advised the court that AWL would not survive unless it entered the injunction. After the injunction was entered, however, Nelsen sold insurance only through his sole proprietorship rather than AWL. Nelsen acknowledged that, in October 2011, the court amended the injunction to require Nelsen to sell insurance only through AWL. Nelsen indicated he received $402,476 in commission payments to his sole proprietorship in 2011 and $42,927 to his sole proprietorship in 2012.

¶ 24                        3. *Anderson's Testimony*

¶ 25        Anderson testified he had worked with Nelsen since 1983. They also had a personal friendship, and Anderson stated he had trusted Nelsen. An exhibit was admitted into evidence showing Anderson's W-2 income from AWL and Moriah Management from 1996 through 2012. The exhibit showed Anderson's salary started at $28,800 in 1996 and it increased over the years, peaking at $52,843 in 2007. Anderson testified that he received his last paycheck in September 2008. At that time, Nelsen told Anderson AWL was not profitable and that they needed to stop taking their salaries. Anderson stated he did not have any Schedule C sole proprietorship income at any time from 1996 through 2012.

¶ 26 Anderson testified that an exhibit admitted during Nelsen's testimony showed that Nelsen was making significantly more money than him from 1996 to 2012. Anderson indicated that Nelsen handled the payroll, and Anderson did not know at the time that Nelsen was receiving more money than him. Anderson and Nelsen would discuss and agree upon their annual salaries, which were always around $40,000. A 2005 e-mail exchange between Anderson and Nelsen was admitted into evidence in which Anderson asked Nelsen what their salaries were. Nelsen replied that Anderson's salary was $75,554.96 per year and that his was $43,290. Anderson testified that Nelsen's statement that Anderson made $75,554 in 2005 was not correct, and his W-2 forms showed he never made that much from AWL. According to Anderson, he did not learn about Nelsen's sole proprietorship and the money going to it until 2019. Anderson stated he felt "betray[ed]" and "disappoint[ed]" when he learned about it.

¶ 27 Anderson testified that he and Nelsen started PSI and PSO in 2001. They transferred a lot of money from AWL to get PSI and PSO up and running. They also funded PSI and PSO with money from Forty Below and loans from banks and individuals. Initially, they each owned 50% of PSI, but Nelsen sold his shares to Anderson in January 2007 for $500. As PSI and PSO became more successful, Anderson spent more of his time working on them. In 2006, he did not renew his insurance license because he was spending so much time working on PSI and PSO.

¶ 28 Anderson began managing PSI's bank account in 2006 or 2007, and Nelsen asked him to repay several debts that he claimed PSI owed to Forty Below and AWL. Anderson wrote checks to AWL and Forty Below for the amounts Nelsen requested, which totaled approximately $2.3 million. A list of checks Anderson had written from PSI's account to AWL, Forty Below, Moriah Management, banks, and individuals between 2004 and 2009 was introduced into

evidence. Anderson indicated that PSI's QuickBooks records were the backup data for this exhibit. The exhibit showed PSI paid a total of $2,362,813.18 to these entities and individuals between 2004 and 2009.

¶ 29 Anderson testified that the Wasserman Group, which was owned by Casey Wasserman, expressed interest in purchasing PSI in November 2006, and a sale eventually went through. The Wasserman Group was to pay PSI $5 million up front and an additional $12 million over the course of five years. However, the Wasserman Group backed out of the sale during the due diligence period and was no longer involved by May 2007. Anderson testified he received only $3 million of the $5 million up-front money. Wasserman kept the other $2 million as repayment for money he had loaned to Anderson during the due diligence period. Anderson also received $750,000 when Wasserman sold his shares in PSI back to Anderson. Anderson used the $3.75 million he received from Wasserman to start PSO Photo, which was a similar business to PSI. Nelsen chose not to be involved in PSO Photo. Anderson indicated that PSO Photo "died" after a failed sale in 2010.

¶ 30 Anderson testified that Wasserman personally loaned him $500,000 in December 2006 and another $850,000 prior to May 2007. Anderson stated he borrowed the money because Nelsen told him that AWL and Forty Below had no money. He used some of it to pay the operating expenses for PSI, but he gave "good chunks" of the money he borrowed to Nelsen "to keep [AWL] and Forty Below alive." Anderson asked Nelsen to provide information concerning how much money PSI and PSO owed to AWL, but Nelsen never provided "final information." This caused problems, as the Wasserman Group's lawyers said they could not "figure anything out because the companies [were] entangled" and "there [were] checks back and forth and all of this kind of stuff."

¶ 31        Anderson testified that, in May 2007, Nelsen sent him an e-mail stating that their wives' phones had been shut off and that various bills were not being paid, including the mortgage on the office building, because AWL did not have enough money to pay them. Anderson was very concerned. Anderson stated he was "flabbergasted" when he later learned Nelsen's sole proprietorship made $977,000 in 2007. Anderson stated: "These were tense times, very tense times and I was firmly convinced that there was just no money." Anderson indicated he borrowed "a lot of money" during that time.

¶ 32        Anderson testified he filed a complaint for an accounting of AWL, Moriah Management, and Forty Below in the instant case in May 2010. In response, Nelsen claimed he owned 100% of AWL and obtained a preliminary injunction against Anderson, which prohibited Anderson from doing anything related to AWL until the trial court determined Anderson was also an owner of AWL in 2017. Anderson indicated that period was "very difficult" because he "didn't have any idea what was going on" and he "didn't have any money." Anderson stated he was 56 years old in 2010, and jobs were not "easy to come by." He had not attempted to renew his insurance license because he could not afford to do so. He also noted that he lived in a "small community" and his "representation [*sic*] ha[d] been trashed" since "all this started." He stated he did not own a car, had been living off loans from friends and family since 2010, and had no source of income until he started receiving Social Security when he turned 66. Anderson testified he and his wife previously had health insurance through Moriah Management but that Nelsen canceled the group insurance policy in September 2010 without informing Anderson. After that, Anderson and his wife had no health insurance until they qualified for Medicare nine years later.

¶ 33        Anderson stated that, regarding his claims of fraud and tortious interference with a business expectancy, he was seeking damages for medical expenses that he had to pay out-of-

pocket during the nine-year period after Nelsen canceled the group health insurance policy. Anderson stated that, during that period, he and his wife had to pay out-of-pocket approximately $30,000 for prescription medications and approximately $35,000 for other medical expenses. Anderson stated his wife was diagnosed with ovarian cancer, and they received large bills during that time. Anderson testified he was also seeking damages for damaged credit, as his credit had been "destroyed" due to his personal debts and the debts of AWL. He indicated his house was in foreclosure and that he could not even get a checking account.

¶ 34        Anderson's counsel asked him if learning what Nelsen had done concerning the sole proprietorship had caused him anguish and emotional distress. Anderson stated that he had not had any money "this entire time" and "had to depend on friends and family to live and help pay attorneys fees." He stated: "[A]nd then finding out nine years into the thing that, you know, there was a million dollars made as a sole proprietor in 2007, that sets you off quite a bit, you know. I mean, it's hard to deal with that. I still don't know how to deal with that."

¶ 35                              4. *Ron Braver's Testimony*

¶ 36        Ron Braver testified as an expert witness in the fields of forensic accounting, forensic fraud, forensic money laundering, and public accounting. Braver stated plaintiffs' counsel gave him documents to review concerning the finances of Moriah Management, AWL, PSI, and Forty Below. Braver testified that, based on his review of the documents, there were indications that Nelsen embezzled funds from AWL. Specifically, Braver noted that many of the QuickBooks entries for AWL were entered months or years after the transactions occurred, and AWL did not pay taxes or file tax returns from 2001 to 2012. Braver also testified that some of the documents indicated that Nelsen intended to deceive or conceal things. For example, after

Anderson requested information from Nelsen concerning AWL's finances, Nelsen began depositing funds into a personal bank account.

¶ 37                                        5. *Nelsen's Testimony in His Case-in-Chief*

¶ 38            Nelsen testified in his case-in-chief that, during the negotiations of the sale to Wasserman, Anderson told him that Wasserman did not want to deal with two owners when he acquired PSI. Anderson stated the plan would be for Nelsen to transfer his shares in PSI to Anderson and that Anderson and Wasserman would each be 50% owners in a new organization, Wasserman Media Group PSO. Anderson would receive $1.5 million, which he would use to pay off all the outstanding debt to individual investors and various corporations. Anderson indicated Nelsen would receive a consulting fee of between $40,000 and $45,000 per year, and eventually Anderson would transfer his 50% interest to his children and Nelsen's children.

¶ 39            Nelsen stated he heard Anderson's testimony about the amounts that Wasserman loaned him, as well as the $3 million he received from Wasserman. Around the time of the sale, Nelsen knew Anderson received one advance payment, but he did not know the amount. Nelsen later learned from a third party that Anderson had received $3 million from Wasserman at the closing, which made Nelsen feel "heartbroken" and "betrayed." Nelsen did not know until the trial that Anderson had received a total of $5 million from Wasserman.

¶ 40            After the Wasserman deal fell through, Nelsen understood that he no longer had an ownership interest in PSI, but he believed he owned 100% of AWL and Forty Below. He indicated that he and Anderson reached an agreement in February or March 2007 to transfer all the shares in AWL to Nelsen, but the transfer never took place. Nelsen's relationship with Anderson had deteriorated in late 2008 and 2009, as Anderson was not fulfilling the agreement.

¶ 41 Nelsen acknowledged that he previously testified concerning instances where he had requested insurance companies to pay commissions to him directly instead of AWL. In one instance, the insurance company would not otherwise issue a check to AWL because one of the owners was not licensed. In other instances, it was because standard practice dictated that the insurance companies issue checks to an individual instead of a company. Nelsen initially deposited the checks issued to him personally into the AWL account, but he later deposited them into two personal accounts that Anderson could not access. In 2008 or 2009, Nelsen began keeping portions of the commissions, but he still put most of the commissions back into AWL.

¶ 42 Nelsen indicated that, around 2010, Forty Below and PSI owed money to AWL, which had provided capital to grow the companies. At that time, Anderson personally owed money to AWL because he charged nondeductible expenses to the corporate credit card. Moriah Management also owed money to AWL. Nelsen stated that, when there was not enough money to cover payroll for Forty Below or PSI, AWL would provide money to Moriah Management and Moriah Management would then cover the payroll. Nelsen indicated that Forty Below and PSI owed this money to Moriah Management, and Moriah Management owed the money to AWL. Nelsen's counsel attempted to have an exhibit admitted purportedly showing the amounts these entities owed, but the trial court refused to admit it because it was not included on Nelsen's pretrial exhibit list.

¶ 43 After Nelsen testified, his counsel indicated he intended to call several other witnesses, including Breitweiser, the next day. However, the next day, Nelsen rested his case without presenting further evidence.

¶ 44 6. *Jury Instructions*

¶ 45 During the jury instruction conference, Nelsen objected to the portion of plaintiffs' instruction No. 15, which permitted the jury to award emotional distress damages for both fraud and tortious interference with a business expectancy, arguing that emotional distress damages were not recoverable under Illinois law for either claim. The trial court ruled that it would give plaintiffs' instruction No. 15 over Nelsen's objection.

¶ 46                                    7. *Verdict*

¶ 47 On June 23, 2021, the jury returned a verdict for Anderson on his claims of tortious interference with a business expectancy and fraud. The jury assessed compensatory damages as follows: (1) $300,000 for lost income, (2) $60,000 for lost benefits, (3) $1,351,000 representing "the amount of money diverted by Nelsen," (4) $25,000 for damage to Anderson's credit, and (5) $1.5 million for emotional distress. The jury also assessed punitive damages against Nelsen in the amount of $2.5 million.

¶ 48                        8. *Ruling on Claims of Breach of Fiduciary Duty*

¶ 49 On August 4, 2021, the trial court denied all the parties' claims of breach of fiduciary duty. The court found Anderson and Nelsen each breached their fiduciary duty to the other in "one way or another during the breakup or the time period close to the breakup" of their businesses. The court stated Anderson and Nelsen operated their businesses "very loosely" and found that the Wasserman deal fell apart because the Wasserman group saw this. The court found that, after their relationship deteriorated, "Mr. Nelsen did things that neither Mr. Anderson [*sic*] knew of or approved of breaching his fiduciary duty to Mr. Anderson." The court found Anderson did things, "particularly with regard to his negotiations with the Wasserman group," that Nelsen was not aware of. The court stated:

"[W]hen we're dealing with a court of equity there's a doctrine called clean hands doctrine that if you are coming into court and asking for some kind of relief in equity, you need to be coming into court with clean hands. I don't see that with regard to both Mr. Nelsen and Mr. Anderson. As I said initially, they both are responsible to a certain extent to where they find themselves today. They are both responsible for why the Wasserman deal maybe didn't go through the way they both were hoping and they both did things, for lack of a better word, behind the other's back."

The court indicated it did not intend to "subtract from or add to the jury verdict" by its rulings and remarks on the claims of breach of fiduciary duty.

¶ 50                                    D. Nelsen's Posttrial Motion

¶ 51        Nelsen filed a posttrial motion pursuant to sections 2-1202(b), 2-1203(a), and 2-1207 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1202(b), 2-1203(a), 2-1207 (West 2020)). This motion included a motion for judgment *n.o.v.*, which alleged, *inter alia*, claims that plaintiffs failed to (1) provide a sufficient basis for the jury to calculate damages for lost benefits and damage to Anderson's credit and (2) present sufficient evidence that Anderson suffered emotional distress due to Nelsen's conduct. The posttrial motion also included a motion for a new trial, which included claims that the trial court erroneously denied Nelsen's motion to disqualify Konicek and erroneously gave plaintiffs' instruction No. 15 because emotional distress damages were not recoverable for fraud. The posttrial motion also contained a motion for a remittitur of punitive damages, claiming that the jury's award of punitive damages was excessive.

¶ 52    Finally, the posttrial motion contained a motion for modification of the judgment or a new trial concerning the trial court's ruling on Nelsen's claims of breach of fiduciary duty. Nelsen argued the court erred by *sua sponte* concluding that his breach of fiduciary duty claims were barred by the unclean hands doctrine because plaintiffs did not raise it as an affirmative defense. Nelsen also claimed the unclean hands doctrine was inapplicable because there was no evidence he engaged in wrongdoing with respect to the Wasserman deal or the loans Anderson and the organizations he controlled owed to AWL and Forty Below.

¶ 53    At a hearing on Nelsen's posttrial motion, Nelsen argued he was substantially prejudiced by Konicek's conflict of interest in representing both Anderson and AWL because Konicek chose not to proceed on AWL's claim for conversion. Nelsen noted that the jury awarded $1,351,000 to Anderson for amounts diverted by Nelsen but argued these amounts were diverted from AWL, of which he owned half, not Anderson. Nelsen argued he was substantially prejudiced by Konicek's dual representation of Anderson and AWL because, if AWL had pursued its conversion claim, Anderson would have only been entitled to half of the diverted funds. The trial court asked Nelsen's counsel if the substantial prejudice to Nelsen would be eliminated if it were to cut the jury's award of $1,351,000 for funds diverted by Nelsen in half. Counsel replied, "It would."

¶ 54    The trial court indicated that it "stood by [its] ruling" on Nelsen's motion to disqualify counsel, but it reduced the jury's award of damages for amounts diverted from AWL by Nelsen to $675,500. The court otherwise denied Nelsen's posttrial motion. Regarding its application of the unclean hands doctrine, the court stated that a court sitting in equity could raise the issue of unclean hands even if it was not pled as an affirmative defense. The court stated it was "standing by" its unclean hands ruling and indicated it had made a "general finding" that

was "not specific to any particular action of either Mr. Nelsen or Mr. Anderson." This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56        On appeal, Nelsen argues the trial court erred by denying his motion to disqualify counsel because he was adversely affected by Konicek's dual representation of AWL and Anderson while allegedly having a concurrent conflict of interest. He also argues the court erred by failing to grant a new bench trial because it abused its discretion by *sua sponte* ruling that the parties' claims of breach of fiduciary duty were barred by the unclean hands doctrine. Additionally, Nelsen contends the court erred by failing to enter judgment *n.o.v.* on the portions of the jury's verdict awarding damages for lost benefits, damage to credit, and emotional distress. Finally, Nelsen contends the court abused its discretion by denying his motion for a remittitur of punitive damages.

¶ 57                          A. Disqualification of Counsel

¶ 58        Nelsen argues the trial court abused its discretion by denying his motion to disqualify Konicek because Konicek's dual representation of AWL and Anderson constituted a concurrent conflict of interest in violation of Illinois Rules of Professional Conduct of 2010 Rule 1.7 (eff. Jan. 1, 2010) and, accordingly, a new trial is warranted. Specifically, Nelsen contends AWL and Anderson had conflicting interests with regard to Nelsen's claim that Anderson breached his fiduciary duty to Nelsen by refusing to pursue the collection of debts that Anderson and entities he controlled owed to AWL and Forty Below. Nelsen notes that Anderson testified that he repaid all these debts, but the proofs of claim filed by Breitweiser in Anderson's bankruptcy proceedings in 2018 (which were not admitted into evidence at trial) indicated the debts were still outstanding. Nelsen contends conflict-free counsel for AWL would have

presented evidence establishing the debts to AWL owed by Anderson and entities that he controlled and that conflict-free counsel "could have done this far more credibly and effectively than Nelsen by calling the Receiver and introducing the proofs of claim in Anderson's bankruptcy case." Nelsen also argues that he was adversely affected by Konicek's decision to forgo AWL's conversion claim because Nelsen was a 50% owner in AWL and, as such, was entitled to retain half the money he diverted.

¶ 59        "Courts have interests in ' "protecting the attorney-client relationship, maintaining public confidence in the legal profession and ensuring the integrity of judicial proceedings" ' and have the authority to disqualify an attorney from representing a particular client to protect those interests." *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 12-13 (2009) (quoting *In re Estate of Klehm*, 363 Ill. App. 3d 373, 376-77 (2006), quoting *SK Handtool Corp. v. Dresser Industries, Inc.*, 246 Ill. App. 3d 979, 989 (1993)). However, "[a]ttorney disqualification is a drastic measure because it destroys the attorney-client relationship by prohibiting a party from representation by counsel of his or her choosing." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 178 (1997).

¶ 60        "A party seeking to disqualify opposing counsel bears a heavy burden of proving a conflict of interest." *In re Estate of M.L.*, 2018 IL App (3d) 170712, ¶ 22. "A party does not have standing to challenge opposing counsel's ability to represent a client without some showing that the representation adversely affects interests of the party challenging opposing counsel's representation." *Id.* ¶ 27. A trial court's determination concerning attorney disqualification will not be disturbed on appeal absent an abuse of discretion. *Schwartz*, 177 Ill. 2d at 176.

¶ 61        Here, even assuming that Konicek labored under a conflict of interest by representing both AWL and Anderson at the trial, a question remains whether this would serve as

a proper basis for ordering a new trial. Nelsen relies on *First National Bank of La Grange v. Glen Oaks Hospital & Medical Center*, 357 Ill. App. 3d 828 (2005), a case involving claims that an attorney engaged in various forms of misconduct during a trial, for the proposition that attorney misconduct can be grounds for a new trial when it results in substantial prejudice to a party. Anderson contends that Nelsen failed to cite any authority for the proposition that the improper denial of a motion to disqualify counsel should result in a new trial and argues that *First National Bank of La Grange* is inapposite because it did not involve an alleged conflict of interest or a motion to disqualify counsel.

¶ 62        Here, we need not determine whether a conflict of interest existed or whether *First National Bank of La Grange* provides a basis for this court to order a new trial because Nelsen has not shown he suffered prejudice in this case. First, Nelsen has waived any claim that he is entitled to a new trial based on Konicek's decision to forgo AWL's conversion claim, as he agreed at the hearing on his posttrial motion that any substantial prejudice he may have suffered would be cured by the trial court's reduction of Anderson's damages for amounts diverted from AWL by Nelsen. See *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 326 (2004) ("Waiver arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right.").

¶ 63        We also find Nelsen has not shown he was substantially prejudiced by Konicek's representation of AWL on the basis that conflict-free counsel would have presented evidence establishing Anderson's debt to AWL by calling Breitweiser and introducing the proofs of claim in Anderson's bankruptcy case. While Nelsen concludes counsel for AWL could have presented this evidence "far more credibly and effectively" than he could have done, he tacitly acknowledges that he too could have presented this evidence in support of his breach of fiduciary

- 19 -

duty claim. He chose not to do so, however, despite indicating during the trial that he planned to call Breitweiser as a witness. Because the record does not show what Breitweiser's testimony would have been, we cannot determine whether it would have contradicted Anderson's testimony that he had repaid the debts Nelsen claimed were owed to AWL and Forty Below. For example, Breitweiser may have testified that he later determined the debts he listed on the proofs of claim were not accurate or had been satisfied. Accordingly, we cannot say, based on the record before us, that Nelsen was substantially prejudiced by Konicek's failure to present this evidence on behalf of AWL.

¶ 64                              B. Unclean Hands Doctrine

¶ 65          Nelsen argues the trial court erred by failing to grant a new bench trial because it abused its discretion by *sua sponte* ruling that Nelsen's counterclaims were barred by the unclean hands doctrine, which was neither pled nor argued by the plaintiffs as an affirmative defense. Nelsen further contends the unclean hands doctrine should not have been applied to some of his counterclaims that Anderson breached his fiduciary duty—namely, claims based on assertions that Anderson concealed and misrepresented the terms of the Wasserman transaction and that Anderson and entities he controlled owed various debts to AWL and Forty Below—because the evidence did not show that Nelsen engaged in wrongdoing with regard to those transactions.

¶ 66          1. *Trial Court's Sua Sponte Application of the Unclean Hands Doctrine*

¶ 67          "Under the 'clean hands' doctrine, a party who has been guilty of misconduct, fraud, or bad faith in connection with the matter in dispute is prohibited from coming to court and asking for equitable relief." *Jackson v. Board of Election Commissioners of Chicago*, 2012 IL 111928, ¶ 26. This doctrine is "based on the principle that litigants should not be permitted to enlist the aid of a court of equity to further their fraudulent or unlawful purposes or take

advantage of their own wrongdoing." *Id.*; see also *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 60 (2009) ("It is a basic maxim of equity that he who seeks equity must do equity."). The application of the unclean hands doctrine is a matter for the trial court's discretion. *Long v. Kemper Life Insurance Co.*, 196 Ill. App. 3d 216, 219 (1990).

¶ 68 The doctrine of unclean hands is an affirmative defense. *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 85. Generally, an affirmative defense must be set forth in the answer or reply to the complaint, and it is forfeited if not raised in a timely fashion in the trial court. *Id.* While Illinois case law supports the proposition that *a party* forfeits the defense of unclean hands by failing to timely raise it in the trial court (see, *e.g.*, *id.* ¶ 86; *Fox v. Seiden*, 2016 IL App (1st) 141984, ¶ 51; *LaGrange Federal Savings & Loan Ass'n v. Rock River Corp.*, 97 Ill. App. 3d 712, 714-15 (1981)), the parties cite no Illinois authority, and we are aware of none, directly addressing the separate question of whether the court may invoke the unclean hands doctrine *sua sponte*.

¶ 69 However, our research reveals federal and out-of-state authority supportive of the proposition that the unclean hands doctrine may indeed be applied by the trial court *sua sponte*. See 30A C.J.S. *Equity* § 116 (August 2023 Update); *Gaudiosi v. Mellon*, 269 F.2d 873, 881 (3d Cir. 1959); *Opperman v. M. & I. Dehy, Inc.*, 644 N.W.2d 1, 6 (Iowa 2002); *Brennan v. Brennan*, 605 So. 2d 749, 752 (Miss. 1992); *Merimac Co. v. Portland Timber & Land Holding Co.*, 488 P.2d 465, 468 (Or. 1971); *Thomas v. McNair*, 882 S.W.2d 870, 880 n.5 (Tex. Ct. App. 1994). This is because, in applying the unclean hands doctrine, "[c]ourts are concerned primarily with their own integrity." *Gaudiosi*, 269 F.2d at 881. "Courts in such situations act for their own protection and not as a matter of 'defense' to the defendant." *Id.* at 882. Illinois courts have also recognized that "[t]he purpose of the 'unclean hands' doctrine is to protect courts of equity from

assisting litigants in accomplishing their fraudulent or unlawful purposes, and not to protect the party raising the doctrine as a defense." *Cole v. Guy*, 183 Ill. App. 3d 768, 776 (1989). Pursuant to this authority, we find the trial court in the instant case did not err in applying the unclean hands doctrine *sua sponte* as a means of protecting the integrity of the court.

¶ 70　　　　We further reject Nelsen's argument that the trial court's *sua sponte* application of the unclean hands doctrine violated his right to due process because he did not have an opportunity to respond to it. Nelsen had an opportunity to respond to the court's application of the unclean hands doctrine during the proceedings on his posttrial motion, which, in our view, was sufficient to satisfy his due process rights. See *Collins v. Department of Health & Family Services ex rel. Paczek*, 2014 IL App (2d) 130536, ¶ 27 (holding the petitioner had a fair opportunity to respond to the trial court's *sua sponte* dismissal of the petition for lack of personal jurisdiction during the hearing on the petitioner's motion to reconsider).

¶ 71　　　　2. *Connection of Alleged Wrongdoing to the Subject of the Litigation*

¶ 72　　　　We next consider Nelsen's argument that the trial court erred in finding the unclean hands doctrine applied to two of his claims of breach of fiduciary duty—namely, that Anderson breached his fiduciary duty by concealing and misrepresenting the terms of the Wasserman transaction and by failing to pursue the collection of debts that Anderson and entities he controlled owed to AWL and Forty Below. Nelsen contends there was no evidence that he engaged in wrongdoing with regard to these two transactions.

¶ 73　　　　　　　　a. Wasserman Transaction

¶ 74　　　　We first consider Nelsen's argument that the trial court erred by finding the unclean hands doctrine applied to his claim that Anderson breached his fiduciary duty to Nelsen by concealing and misrepresenting various terms of the Wasserman transaction, including

"misrepresenting that Wasserman was unwilling to deal with Nelsen and wanted only Anderson to be the other 50% owner of [Wasserman Media Group PSO]." Nelsen contends the court did not find that he directed fraud or bad faith toward Anderson with regard to the Wasserman transaction and that there was no evidence presented at the trial to support such a finding.

¶ 75        "The doctrine of clean hands will only be applied where the alleged misconduct is connected to the matter in litigation." *Hagshenas v. Gaylord*, 199 Ill. App. 3d 60, 74 (1990); see also *Gambino*, 398 Ill. App. 3d at 60 ("The doctrine is unavailable where the act giving rise to the defense does not directly involve the transaction which is the subject of the litigation.").

¶ 76        We find the trial court did not abuse its discretion in applying the unclean hands doctrine to Nelsen's claim that Anderson breached his fiduciary duty to Nelsen by concealing and misrepresenting various terms of the Wasserman transaction. While the court did not make specific factual findings as to Nelsen's misconduct regarding the Wasserman transaction, there was sufficient evidence at the trial to support its application of the unclean hands doctrine to this claim. The trial evidence showed the Wasserman transaction failed largely due to the haphazard operation of Anderson and Nelsen's companies. Anderson testified that the Wasserman Group's lawyers could not "figure anything out because the companies [were] entangled." Anderson indicated that, during the due diligence period, he requested information from Nelsen concerning the amounts PSI and PSO owed to AWL, but Nelsen never gave him "final information" concerning these amounts. The trial evidence could also support an inference that Nelsen's loose operation of AWL's finances and his failure to provide adequate financial information regarding AWL for review by Wasserman's attorneys was due to his desire to conceal his wrongful conduct, including diversion of commission payments. Accordingly, the trial evidence could

reasonably support a finding that Nelsen's misconduct was sufficiently related to the Wasserman transaction to support the court's application of the unclean hands doctrine.

¶ 77                                    b. Anderson's Debts to AWL

¶ 78         Nelsen also argues that the trial court erred in finding the unclean hands doctrine applied to his claim that Anderson breached his fiduciary duty to Nelsen by failing to pursue the collection of debts that Anderson and entities he controlled owed to AWL and Forty Below. Nelsen contends there was no evidence presented at the trial to support a finding that he directed fraud or bad faith toward Anderson with respect to these loans. Anderson contends that the court did not err in applying the unclean hands doctrine. Anderson also argues we may affirm on the alternative basis that Nelsen failed to prove this breach of fiduciary duty claim by a preponderance of the evidence.

¶ 79         We find, even accepting Nelsen's claim that the trial court erred by applying the unclean hands doctrine to his breach of fiduciary duty claim concerning the debts Anderson and entities he controlled owed to AWL and Forty Below, we may affirm on the alternative basis that Nelsen did not meet his burden of proving this claim by a preponderance of the evidence. See *Pekin Insurance Co. v. AAA-1 Masonry & Tuckpointing, Inc.*, 2017 IL App (1st) 160200, ¶ 21 ("On appeal, a reviewing court may affirm the trial court's ruling for any reason supported by the record regardless of the basis relied upon by the trial court.").

¶ 80         "To state a claim for breach of fiduciary duty, it must be alleged and ultimately proved: (1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. Also, "[i]n an action for breach of fiduciary

- 24 -

duty, the party seeking damages must supply a reasonable basis for the computation of those damages." *Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 83.

¶ 81 In the instant case, Nelsen did not present sufficient evidence at trial to support his claim that Anderson breached his fiduciary duty to Nelsen by refusing to pursue the collection of debts that Anderson, PSI, and PSO Photo owed to AWL and Forty Below. The only evidence that Nelsen presented in support of this claim was his own conclusory testimony that PSI, PSO, Moriah Management, and Anderson owed unspecified amounts of money to AWL "around 2010." This vague testimony was insufficient to establish the existence of these debts or that they were still owing. While Nelsen attempted to offer an exhibit purportedly establishing the amount of these debts, the trial court refused to admit it into evidence. As there was no evidence concerning the amount of the debts, there was no basis on which the court could have computed damages. We note that on appeal Nelsen does not claim the court erred in denying admission of his trial exhibit.

¶ 82 While Nelsen notes that the trial court expressly found Anderson breached his fiduciary duty to Nelsen, the court indicated this was only a "general finding" that was "not specific to any particular action" of Anderson. As such, the court's finding does not preclude us from finding that Nelsen presented insufficient evidence to support this particular claim of breach of fiduciary duty.

¶ 83                                    C. Judgment *N.O.V.*

¶ 84 Nelsen argues the trial court erred by denying his motion for judgment *n.o.v.* as to the jury's award of damages to Anderson for lost benefits, damage to credit, and emotional distress.

¶ 85 Judgments *n.o.v.* should be entered " 'only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' " *Jablonski v. Ford Motor Co.*, 2011 IL 110096, ¶ 88 (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). That is, "a motion for judgment *n.o.v.* presents ' "a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case." ' " *Id.* (quoting *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006), quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942)). "[A] judgment *n.o.v.* may not be granted merely because a verdict is against the manifest weight of the evidence." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). We review *de novo* the trial court's denial of Nelsen's motion for judgment *n.o.v.* *Jablonski*, 2011 IL 110096, ¶ 88.

¶ 86                                              1. *Lost Benefits*

¶ 87 Nelsen argues the trial court erred by denying his motion for judgment *n.o.v.* on the portion of the jury verdict awarding Anderson $60,000 in damages for lost benefits and in failing to vacate that portion of the judgment because Anderson failed to show a basis for computing these damages with a fair degree of accuracy. Nelsen contends that Anderson's testimony that he had to pay out-of-pocket approximately $30,000 for prescription drugs and $35,000 for medical expenses as a result of Nelsen canceling the group health insurance policy that covered Anderson and his wife was speculative. Nelsen argues these damages could have been "easily demonstrated with precision" by medical bills and receipts for prescriptions and

contends that Anderson did not present evidence that he would have had no out-of-pocket expenses if the policy had still been in place.

¶ 88 Damage is an essential element of both fraud and tortious interference with a business expectancy. *Castlerigg Master Investments, Ltd. v. AbbVie, Inc.*, 2021 IL App (1st) 200527, ¶ 20; *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 532 (1993). "Absolute certainty about the amount of damage is not necessary to justify a recovery if damage is shown, but damages may not be predicated on 'mere speculation, hypothesis, conjecture or whim.' " *City of Chicago v. Michigan Beach Housing Cooperative*, 297 Ill. App. 3d 317, 323 (1998) (quoting *In re Application of Busse*, 124 Ill. App. 3d 433, 438-39 (1984)). "The evidence must show a basis for computing damages with a 'fair degree of probability.' " *Id.* (quoting *Barnett v. Caldwell Furniture Co.*, 277 Ill. 286, 289 (1917)). The plaintiff bears the burden of establishing a reasonable basis for calculating damages. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 107 (2006).

¶ 89 Here, the trial court did not err in denying Nelsen's motion for judgment *n.o.v.* as to the portion of the jury's verdict awarding Anderson $60,000 in damages for lost benefits. Viewing the evidence in the light most favorable to Anderson, we cannot say the trial evidence so overwhelmingly favored Nelsen that a contrary verdict could never stand. Anderson testified that, after Nelsen cancelled the group health insurance policy that covered him and his wife, they did not have health insurance for nine years. Anderson stated that, during that nine-year period, they incurred out-of-pocket medical expenses in the amounts of approximately $30,000 for prescription drugs and $35,000 for other medical expenses. The amount of Anderson's out-of-pocket medical expenses was a matter within his personal knowledge, and it was for the jury to determine what weight to give to his testimony. See *Maple*, 151 Ill. 2d at 452 ("[I]t is the

province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony."). While the evidence of damages for Anderson's lost benefits would have been stronger if he had presented corroborating evidence of medical bills and prescription drug receipts, his testimony concerning his expenses, when viewed in the light most favorable to him, did not constitute " 'mere speculation, hypothesis, conjecture or whim.' " *Michigan Beach Housing Cooperative*, 297 Ill. App. 3d at 323 (quoting *Busse*, 124 Ill. App. 3d at 438-39).

¶ 90        We reject Nelsen's reliance on *Wills v. Foster*, 229 Ill. 2d 393, 413 (2008), for the proposition that Anderson was required to establish that the amounts he sought in lost benefit damages constituted the reasonable value of the services provided. *Wills* was a personal injury case that considered the question of how the collateral source rule applied when an injured plaintiff's medical bills were paid by Medicare or Medicaid at a discounted rate. *Id.* at 399. The *Wills* court held that the plaintiff was entitled to recover the reasonable value of her medical expenses and was not limited to recovering the amount actually paid by Medicare and Medicaid. *Id.* at 420. In the instant case, unlike in *Wills*, Anderson did not seek compensatory damages for treatment of a physical injury for which Nelsen was liable but rather for the costs he incurred due to Nelsen's cancellation of his health insurance. Accordingly, we find *Wills*'s discussion of the amount of the damages recoverable in personal injury cases to be inapposite.

¶ 91                                     2. *Damage to Credit*

¶ 92        Nelsen also argues the trial court erred in denying his motion for judgment *n.o.v.* on the portion of the jury verdict awarding Anderson $25,000 in damages for damage to his credit and in failing to vacate that portion of the judgment. Nelsen argues Anderson failed to prove his poor credit and foreclosure were proximately caused by Nelsen's conduct rather than

the fact that Anderson had been unemployed for over 10 years. Nelsen also argues Anderson failed to provide the jury with a reasonable basis for computing damages for harm to Anderson's credit. Anderson contends the jury's award of $25,000 for damage to his credit was proper because "jurors are allowed to use their own observation and experience in assessing damages." *Snelson v. Kamm*, 204 Ill. 2d 1, 30 (2003).

¶ 93        We agree with Nelsen that the trial court erred by denying his motion for judgment *n.o.v.* on the portion of the verdict awarding damages in the amount of $25,000 for damage to Anderson's credit because Anderson failed to provide a reasonable basis for calculating these damages. It is the plaintiff's burden to establish a reasonable basis for calculating damages. *Razor*, 222 Ill. 2d at 107. As previously stated, while absolute certainty as to the amount of damage is not required, "damages may not be predicated on 'mere speculation, hypothesis, conjecture or whim.' " *Michigan Beach Housing Cooperative*, 297 Ill. App. 3d at 323 (quoting *Busse*, 124 Ill. App. 3d at 438-39). "The evidence must show a basis for computing damages with a 'fair degree of probability.' " *Id.* (quoting *Barnett*, 277 Ill. at 289).

¶ 94        We find our supreme court's decision in *Razor* to be instructive. While *Razor* involved a claim for breach of warranty under the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (15 U.S.C. § 2301 *et seq.* (2000)) rather than a claim of fraud or tortious interference with a business expectancy, the same general principles for proving damages applied by the *Razor* court are applicable in the instant case. See *Razor*, 222 Ill. 2d at 106-07 (" 'While it is not necessary that damages for breach of warranty be calculated with mathematical precision [citation], basic contract theory requires that damages be proved with reasonable certainty and precludes damages based on conjecture or speculation [citation].' " (quoting *Ouwenga v. Nu-Way Ag, Inc.*, 239 Ill. App. 3d 518, 523 (1992))).

¶ 95        In *Razor*, the court held there was an insufficient basis for the jury's $5000 warranty damage award for the decreased value of the plaintiff's vehicle. *Id.* at 107. The court noted the only possible evidence of how much the vehicle's value had decreased was the plaintiff's testimony that she would not pay the price she had originally paid for the vehicle given the problems she had had with it. *Id.* The court stated: "There is simply no way for the jury to get from this testimony to a $5,000 award without engaging in speculation and conjecture." *Id.* In reaching its holding, the *Razor* court rejected the plaintiff's argument that jurors have sufficient familiarity with cars that they should be permitted to determine how much a car's value would be diminished by the events that occurred in that case. *Id.* at 108. The court stated:

> "Although jurors are not required to check their common sense at the courtroom door [citation], we are not prepared to endorse the proposition that jurors are as a class sufficiently familiar with automobiles as to be able to determine the degree of diminution of a particular vehicle's value based on a particular defect without the need for any evidence at all. This is more than a matter of simple common sense." *Id.*

The court noted that "[t]here was no number presented, nothing for the jury to work from." *Id.*

¶ 96        In the instant case, like in *Razor*, there was no way for the jury to get from Anderson's testimony that he had "no credit" and could not even get a checking account to its $25,000 damages award without engaging in speculation or conjecture. While Anderson's counsel requested a $25,000 award for damage to Anderson's credit during closing argument, no evidence was presented at the trial supporting this particular figure. Anderson argues on appeal that the jurors could "use their own observation and experience in assessing damages." *Snelson*, 204 Ill. 2d at 30. However, we do not believe that quantifying the damage to Anderson's credit

was a "matter of simple common sense" (*Razor*, 222 Ill. 2d at 108) that the jury could undertake in the absence of any evidence supporting the amount of $25,000 for damage to credit.

¶ 97                                              3. *Emotional Distress*

¶ 98        Nelsen argues the trial court erred in failing to enter judgment *n.o.v.* on the $1.5 million jury award for emotional distress because it was improper to permit the jury to assess emotional distress damages on the claims of fraud and tortious interference with a business expectancy. Nelsen also argues that Anderson failed to present sufficient evidence to show that he suffered an emotional injury. Alternatively, Nelsen argues that the $1.5 million award of emotional distress damages must be remitted to an amount that does not shock the judicial conscience.

¶ 99              a. Permitting Jury to Assess Damages for Emotional Distress

¶ 100        Nelsen first contends the trial court erred in failing to enter judgment *n.o.v.* on the $1.5 million damages award for emotional distress because it was improper for the jury to assess damages for emotional distress for fraud. Nelsen also argues Anderson failed to establish that Illinois law permits recovery of damages for emotional distress due to tortious interference with a business expectancy. Nelsen contends the court erred by failing to modify plaintiffs' instruction No. 15 to omit "emotional distress" from the elements of damage the jury was to consider and by failing to remove the line item for "emotional distress" from the verdict form.

¶ 101        Even if we were to accept Nelsen's argument that emotional distress damages are not recoverable for fraud (see *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1088 (2010) ("[D]amages for solely emotional harm are not recoverable in an action for fraud.")), Nelsen has not established that emotional distress damages may not be recovered for tortious interference

- 31 -

with a business expectancy. Section 774A(1) of the Restatement (Second) of Torts (1979) provides:

> "One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for
>
> (a) the pecuniary loss of the benefits of the contract or the prospective relation;
>
> (b) consequential losses for which the interference is a legal cause; and
>
> (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." Restatement (Second) of Torts § 774A(1) (1979).

The First District of our appellate court has cited with approval section 774A(1) of the Restatement. See *Koehler v. The Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 64; *Reuben H. Donnelley Corp. v. Brauer*, 275 Ill. App. 3d 300, 313 (1995). We also note that, in applying Illinois law, the United States Court of Appeals for the Seventh Circuit has held that emotional distress damages are recoverable in a claim for tortious interference with a contract. *Stafford v. Puro*, 63 F.3d 1436, 1443 (7th Cir. 1995).

¶ 102        Based on the foregoing authority, the trial court in the instant case properly allowed the jury to assess emotional distress damages for tortious interference with a business expectancy. As the jury found in favor of Anderson on his tortious interference with a business expectancy claim as well as his fraud claim, judgment *n.o.v.* on the portion of the jury's verdict awarding emotional distress damages is not warranted.

¶ 103        Nelsen notes that neither *Koehler* nor *Reuben H. Donnelley Corp.* explicitly mentions emotional distress damages when discussing the damages recoverable for intentional

interference with contractual relations pursuant to section 774A(1) of the Restatement (Second) of Torts. See *Reuben H. Donnelley Corp.*, 275 Ill. App. 3d at 313 ("Thus, the damages recoverable when a plaintiff proves intentional interference with contractual relations include pecuniary loss of the benefits of the contract; actual harm to reputation, if they are reasonably to be expected to result from the interference [citation]; and consequential losses for which the interference is the legal cause."); see also *Koehler*, 2016 IL App (1st) 142767, ¶ 64. However, we do not find the failure to expressly mention emotional distress damages in these cases indicates an intent to deviate from the language of section 774A(1) of the Restatement. Emotional distress damages were not sought by the plaintiffs in either case, and neither case expressly indicates that emotional distress damages are not recoverable. See *Reuben H. Donnelley Corp.*, 275 Ill. App. 3d at 313-14; *Koehler*, 2016 IL App (1st) 142767, ¶ 64.

¶ 104                          b. Evidence of Emotional Distress

¶ 105          Nelsen argues that, even if damages for emotional distress may be recovered, the trial court erred in denying his motion for judgment *n.o.v.* as to the jury's $1.5 million award of damages for emotional distress because Anderson failed to present sufficient evidence to justify the award. Nelsen contends that Anderson's request for emotional distress damages was based solely on his testimony that learning about Nelsen's actions with regard to his sole proprietorship "set[ him] off quite a bit" and that it was "hard to deal with that." Nelsen argues this testimony was vague and conclusory and did not support the jury's award of $1.5 million for emotional distress.

¶ 106          Our supreme court has held that expert testimony is not necessary to establish emotional distress. *Thornton v. Garcini*, 237 Ill. 2d 100, 109 (2009). Rather, in some cases, the jury can reasonably conclude based on personal experience alone that the circumstances of the

case caused the plaintiff emotional distress. *Id. Thornton* involved a claim of negligent infliction of emotional distress rather than tortious interference with a business expectancy, but the parties agree that its holding applies to the instant case.

¶ 107    We find that the trial evidence and inferences to be drawn from it, viewed in the light most favorable to Anderson, do not so overwhelmingly favor Nelsen that the portion of the jury's verdict awarding emotional distress damages could never stand. See *id.* at 107. Anderson testified that he felt betrayed and disappointed when he learned that Nelsen had been siphoning money to himself by way of a sole proprietorship separate from AWL. Anderson indicated that learning Nelsen made approximately $1 million from his sole proprietorship in 2007 left him "flabbergasted" and "set[ him] off quite a bit" and that it was "hard to deal with." Anderson indicated Nelsen had represented to him at that time that AWL was struggling to pay its bills, and Anderson was convinced "there was just no money." Anderson indicated he incurred a large amount of debt at that time. Anderson presented evidence that he stopped receiving a salary in September 2008 because Nelsen told him there was not enough money to pay it but, unbeknownst to him, Nelsen continued to receive a salary and directed commission payments to his sole proprietorship.

¶ 108    Anderson testified that he suffered significant financial problems as a result of all this, including having to depend on family and friends "to live," his house going into foreclosure, having his credit ruined, and losing his health insurance and having to pay out-of-pocket for his wife's cancer treatments. He also stated that he lived in a small community and his reputation had been "trashed." Although the trial transcript indicates Anderson used the word "representation," it is clear from the context of his testimony that he intended to say, or did say, "reputation." A jury could have reasonably found, based on Anderson's testimony, that he

- 34 -

suffered emotional distress as a result of these circumstances. Also, as the trier of fact, the jury observed Anderson's demeanor while testifying and was best able to judge his credibility and determine the weight to give his testimony. See *Cosmopolitan National Bank v. County of Cook*, 103 Ill. 2d 302, 315 (1984).

¶ 109 In reaching our holding, we reject Nelsen's reliance on *Stafford*, for the proposition that Anderson's testimony was too conclusory to support an award of emotional distress damages. The *Stafford* court held that the plaintiff's unrebutted testimony concerning the effects of the defendants' conduct was not conclusory and that it adequately demonstrated his entitlement to emotional distress damages. *Stafford*, 63 F.3d at 1445. In that case, the plaintiff testified that he felt " 'emotionally stressed out,' " and he detailed the financial problems and the physical manifestations of his stress arising from his financial problems. *Id.* Specifically, the plaintiff testified he could not pay his credit card bills, which ruined his credit rating; he used all his life savings to pay his living expenses and eventually lost his home after taking out a second mortgage; and he suffered from high blood pressure and a spastic colon as a result of these financial difficulties. *Id.*

¶ 110 Here, similar to *Stafford*, Anderson did not merely give conclusory testimony that Nelsen's conduct "set[ him] off" or was "hard to deal with." He discussed having specific, significant financial problems. While Anderson did not testify concerning physical symptoms he experienced due to these financial issues, his testimony, viewed in the light most favorable to him, adequately demonstrated his entitlement to damages for emotional distress.

¶ 111 c. Remittitur

¶ 112 Nelsen alternatively argues that, even if we find Anderson's trial testimony was sufficient to support an award of damages for emotional distress, the $1.5 million award must be

remitted to an amount that does not shock the judicial conscience. We find Nelsen forfeited his request for a remittitur of the jury's award of damages for emotional distress by failing to raise the issue in his posttrial motion. See Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 1, 1994); *Ostry v. Chateau Ltd. Partnership*, 241 Ill. App. 3d 436, 443 (1993) ("Defendant waived its right to request a remittitur by not raising that issue in its post-trial motion."). While Anderson did not argue in his appellee brief that this issue was forfeited, our supreme court has indicated that we may consider the issue of forfeiture *sua sponte*. See *People v. Smith*, 228 Ill. 2d 95, 106 (2008) ("[T]he ascertainment of its own jurisdiction is one of the two most important tasks of an appellate court panel when beginning the review of a case. The other is to determine which issue or issues, if any, have been forfeited.").

¶ 113    D. Trial Court's Denial of Motion for Remittitur of Punitive Damages

¶ 114    Nelsen argues the trial court abused its discretion in denying his motion for a remittitur of the $2.5 million punitive damages award. Nelsen contends the "enormity of the wrong," a factor the jury was to consider in its assessment of punitive damages, was significantly diminished by the court's subsequent ruling that Anderson breached his fiduciary duty to Nelsen and the court's reduction of the compensatory damages awarded to Anderson for money Nelsen diverted from AWL from $1,351,000 to $675,500. Nelsen argues the court failed to consider the enormity-of-the-wrong factor when it denied Nelsen's motion for a remittitur.

¶ 115    "Punitive damages may be awarded when the defendant's tortious conduct evinces a high degree of moral culpability ***." (Internal quotation marks omitted.) *Lawlor*, 2012 IL 112530, ¶ 58. Such damages may be awarded "when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' " (Internal

- 36 -

quotation marks omitted.) *Id.* (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)).

"Punitive damages are intended to punish the wrongdoer and to deter that party, and others, from

committing similar acts in the future." *Deal v. Byford*, 127 Ill. 2d 192, 203 (1989). Punitive

damages are "not favored in the law" due to their penal nature. *Id.*

¶ 116          Pursuant to section 2-1207 of the Code (735 ILCS 5/2-1207 (West 2020)), "[t]he

trial court may, in its discretion, with respect to punitive damages, determine whether a jury

award for punitive damages is excessive, and if so, enter a remittitur and a conditional new trial."

In reviewing an award of punitive damages, relevant circumstances include, but are not limited

to, "the nature and enormity of the wrong, the financial status of the defendant, and the potential

liability of the defendant." *Deal*, 127 Ill. 2d at 204. Each case must be assessed in light of its

particular facts and circumstances. *Id.* "The amount of punitive damages will not be reversed

unless it must have been the result of passion, partiality or corruption." *Leyshon v. Diehl

Controls North America, Inc.*, 407 Ill. App. 3d 1, 13 (2010).

¶ 117          We review the trial court's ruling on a motion for remittitur for an abuse of

discretion. *Estate of Oglesby v. Berg*, 408 Ill. App. 3d 655, 661 (2011). "We will find an abuse of

discretion only if the trial court's ruling was arbitrary, ignored recognized principles of law or if

no reasonable person would take the position adopted by the trial court." *Id.*

¶ 118          Here, we cannot say the trial court abused its discretion in denying Nelsen's

motion for a remittitur of the $2.5 million punitive damages award. Anderson presented

sufficient evidence to justify an award of punitive damages. Anderson presented evidence that

Nelsen misrepresented his salary to Anderson for years, receiving a significantly higher salary

than he told Anderson he received. Nelsen also misrepresented the financial situation of AWL to

Anderson in 2007 and 2008, and as a result, Anderson incurred significant debt and went without

a salary from AWL starting in September 2008. Anderson also presented evidence that Nelsen, unbeknownst to Anderson, created a sole proprietorship while he was an officer of AWL, and he directed several insurance companies to pay commissions to him directly instead of AWL. The evidence showed commission payments continued to be paid to Nelsen's sole proprietorship even after the court directed him to sell insurance only through AWL.

¶ 119    We reject Nelsen's argument that the trial court abused its discretion in denying his motion for remittitur on the basis that the court's subsequent finding that Anderson breached his fiduciary duty to Nelsen significantly diminished the enormity of the wrong. The jury heard the evidence upon which the court based its finding that Anderson breached his fiduciary duty to Nelsen. Even so, the jury found a punitive damages award in the amount of $2.5 million was appropriate based on Nelsen's conduct. Moreover, the court expressly indicated it did not intend to "subtract from or add to the jury verdict" by its ruling on the claims of breach of fiduciary duty.

¶ 120    We also reject Nelsen's argument that the trial court abused its discretion in denying his motion for a remittitur of the punitive damages award because its order reducing the compensatory damages award for money diverted from AWL by Nelsen from $1,351,000 to $675,500 significantly impacted the enormity-of-the-wrong factor. Nelsen contends that the jurors would have assessed a smaller punitive damages award "had they known the true amount of money diverted from AWL was $675,500 not $1,351,000." However, the basis for the court's reduction in damages was not that Nelsen diverted less money from AWL than the jury had determined. Rather, the court found Nelsen was entitled to half the diverted money, as he was a 50% shareholder of AWL. The jury was aware that Nelsen owned half of AWL when it entered its punitive damages award. It does not follow from the court's finding that Anderson was not

- 38 -

entitled to all the money diverted by Nelsen that Nelsen's conduct was somehow less serious than the jury initially determined.

¶ 121       We reject Nelsen's reliance on *Lee v. Heights Bank*, 112 Ill. App. 3d 987, 998 (1983), in support of his argument that the trial court abused its discretion by failing to order a remittitur of the punitive damages award. In *Lee*, the plaintiff argued the trial court abused its discretion by ordering a remittitur reducing the punitive damages award from $50,000 to $22,000. *Id.* The appellate court held the reduction in punitive damages was not an abuse of discretion due to the vicarious nature of the defendant's liability. *Id.* The *Lee* court noted that the trial court had reduced the compensatory damages by the same proportion, namely, from $25,000 to $10,993.62. *Id.* The court noted that, had the court not ordered a remittitur of the punitive damages, the punitive damages would have been almost five times greater than the compensatory damage. *Id.* The court held the remittitur was "a reasonable exercise of the court's discretion" because it reduced this disparity. *Id.*

¶ 122       In the instant case, unlike in *Lee*, vicarious liability is not at issue. Also, the amount by which the trial court reduced the compensatory damages in the instant case was not as significant as in *Lee*, as the total compensatory damages here were reduced by approximately 20% (from $3,236,000 to $2,560,500) compared to a 44% (from $25,000 to $10,993.62) reduction in *Lee*. Moreover, "[t]here is no requirement that the amount of punitive damages imposed on a defendant bear any particular proportion to the size of the plaintiff's compensatory recovery." *Deal*, 127 Ill. 2d at 204. Also, unlike in *Lee*, we are reviewing a trial court's decision *not* to order a remittitur. The fact that the *Lee* court found the trial court's proportionate reduction of punitive damages in that case did not constitute an abuse of discretion does not

mean that such a reduction must always be made. We find the court's decision not to order a remittitur in the instant case was not an abuse of discretion.

¶ 123                                  III. CONCLUSION

¶ 124          For the reasons stated, we reverse the trial court's order denying Nelsen's motion for judgment *n.o.v.* as to the portion of the jury's verdict awarding $25,000 for damages to Anderson's credit, and we remand with directions that the trial court vacate that portion of the jury's verdict. We otherwise affirm the judgment of the trial court.

¶ 125          Affirmed in part and reversed in part; cause remanded with directions.

*Anderson v. Nelsen*, 2023 IL App (4th) 220801

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Whiteside County, No. 10-CH-93; the Hon. Stanley B. Steines, Judge, presiding. |
| **Attorneys for Appellant:** | Christopher J. Drinkwine, of Heyl, Royster, Voelker & Allen, P.C., of Rockford, for appellant. |
| **Attorneys for Appellee:** | Daniel F. Konicek and Amanda J. Hamilton, of Konicek & Dillon, P.C., of Geneva, for appellees. |